People v Shaw (2026 NY Slip Op 00961)

People v Shaw

2026 NY Slip Op 00961

Decided on February 19, 2026

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 19, 2026

No. 113

[*1]The People & c., Respondent,
vSamuel Shaw, & c., Appellant.

Clea Weiss, for appellant.
Martin P. McCarthy, II, for respondent.

HALLIGAN, J.

:
The defendant was convicted of two counts of murder in the first degree, two counts of murder in the second degree, attempted murder in the second degree, assault in the first degree, and three counts of criminal possession of a weapon in the second degree, stemming from a shooting that left two people dead and another paralyzed. On appeal, he argues that a gun discovered in an apartment where he stayed overnight should have been suppressed because he was arrested in violation of Payton v New York (445 US 573 [1980]), and that the subsequent search of the apartment was based on consent from the tenant that was neither voluntary nor attenuated from the illegal arrest. Although there is more than sufficient record support for the Appellate Division's conclusion that the defendant was coerced to leave the apartment in violation of Payton, the Appellate Division applied the wrong legal standard to determine whether the tenant's consent was voluntary. We therefore remit the matter to the Appellate Division for application of the correct legal standard. Because we conclude that any error would be harmless in relation to all counts except for count nine, charging the defendant with criminal possession of a weapon in the second degree, the Appellate Division need consider only that count on remittal.[*2]I.
The evidence at trial established that in June 2018, defendant Samuel Shaw shot and killed two people and paralyzed another in a parking lot in the City of Rochester. Two eyewitnesses, including the surviving victim, identified the defendant as the shooter the next day. Those identifications were supported by forensic evidence. The police recovered shell casings, projectiles, and a magazine ejected from a handgun from the scene of the shooting. They determined that the casings and projectiles had been fired from the same 9-millimeter handgun, and the magazine had the defendant's palm print on it. Following the defendant's arrest, police discovered a 9-millimeter handgun inside a toilet tank located in an apartment where the defendant had stayed overnight. As a result of a search warrant executed at a different address, the police also found an empty box for a 9-millimeter handgun bearing the same serial number as the gun discovered at the apartment, and identified the defendant's fingerprints on the box.
This appeal concerns the legality of the defendant's arrest and subsequent search of the apartment. On July 21, 2018, fifteen members of the Monroe County SWAT team and additional uniformed officers arrived at the apartment in an armored vehicle called a BearCat. The SWAT team members wore body armor and camouflage tactical clothing and carried assault rifles. The defendant did not live in the apartment but had been there for approximately 18 hours and stayed overnight the prior evening. An officer admitted that the police chose not to obtain an arrest warrant for the defendant because they wanted to interview him before his right to counsel attached.
A police investigator testified that upon seeing the defendant through the apartment window, he shouted at him to "come on out, house is surrounded . . . come out empty handed and come out with your hands up." The defendant then "shooed" the tenant of the apartment and her 16-year-old cousin into the laundry room and exited the building, at which point he was taken into custody. Officers then entered the apartment and ordered the tenant and her cousin to "come out with [their] hands up" and lie face down with "guns to [them]." The tenant testified that she was scared; she and her cousin were handcuffed; and the police separated them and put the tenant into the back of a police patrol car, where she could not see her cousin and remained for approximately five to seven minutes. An officer obtained the tenant's consent to search. While the record is unclear as to whether verbal consent was provided when the tenant was still handcuffed, an officer removed her handcuffs before she signed a written consent to search form. The tenant testified that she was not intimidated throughout this encounter and that police neither promised anything in exchange for her consent nor threatened her. After the tenant signed the consent form, officers searched the apartment and found a gun inside the toilet tank in the bathroom.
Before trial, the defendant moved to suppress the gun, arguing that his arrest violated Payton v New York (445 US 573 [1980]), and that the tenant's consent to search the apartment was neither voluntary nor sufficiently attenuated from the Payton violation. The People responded that there was no Payton violation because the defendant had been taken into custody outside the apartment, and that he had no reasonable expectation of privacy in the apartment and thus lacked standing to challenge the search.
The trial court denied the suppression motion, holding that the defendant's arrest did not implicate Payton because he was arrested outside the apartment. The court further held that the defendant lacked standing to challenge the search and, in any event, the tenant had voluntarily consented to the search. The case proceeded to trial and the defendant was convicted of all charges and sentenced to life in prison without the possibility of parole.
On appeal, the Appellate Division held that the defendant's arrest violated Payton, but that suppression of the gun was not required. With respect to the arrest, the Court found that "the number of officers, their attire in tactical SWAT gear, and their manner of entry constitute coercive circumstances suggesting that defendant was submitting to authority by leaving the apartment," rather than doing so voluntarily (229 AD3d 1180, 1184 [4th Dept 2024] [internal quotation marks omitted]). The Court further concluded that despite the Payton violation, the tenant's consent to search the apartment was "voluntarily [*3]given" and attenuated any initial illegality (id.)[FN1]. One Justice dissented, concluding that the consent to search was neither voluntary nor sufficiently attenuated, but would have found the error harmless in relation to the defendant's convictions for murder in the first degree, attempted murder in the second degree, assault in the first degree, and two of the three counts of criminal possession of a weapon in the second degree (see id. at 1187 [Ogden, J., dissenting]). The dissenting Justice granted the defendant leave to appeal to this Court.II.
A.
Initially, we reject the People's argument that the defendant failed to preserve his contention that his arrest violated Payton. In his suppression motion, the defendant argued that "officers from the Rochester Police Department ordered the defendant to exit his temporary domicile and arrested him," that the arrest violated Payton, and that the firearm recovered from the apartment "was obtained as the direct and unattenuated result of an unlawful police arrest" and should be suppressed. Defense counsel made similar points at the suppression hearing. These arguments were sufficient to alert the trial court to the nature of the defendant's claim and preserve the argument for review. We also conclude that the defendant has standing to raise this challenge because, as an overnight guest, he had a reasonable expectation of privacy in the apartment (see Minnesota v Olson, 495 US 91, 96-97 [1990]).B.
In Payton v New York, the U.S. Supreme Court held that absent exigent circumstances, the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest" (445 US 573, 576 [1980]). This rule is grounded in the "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic" (id. at 601). Indeed, the "zone of privacy" protected by the Fourth Amendment is at its apex "when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated' " (id. at 589).
The defendant contends that even though he was taken into custody outside the apartment, his arrest nonetheless violated his rights conferred by the Fourth Amendment and article I, section 12 of the New York Constitution, under a theory of "constructive entry." Although Payton does not squarely address these circumstances, it makes clear that the home lies at the "very core" of the Fourth Amendment (id. at 589-590; see also People v Minley, 68 NY2d 952, 953 [1986] ["The evil to which the [Payton] rule is addressed is the unsupervised invasion of a citizen's privacy in his own home."]). When officers subject someone to a display of authority that induces them to exit the home under coercion, the sanctity of the home has been invaded to the same extent as if the officers had physically entered. Such a show of force violates Payton and renders an arrest unlawful under both the Fourth Amendment and the New York Constitution, just as it would be if the arrest occurred within the confines of the home itself.
That conclusion accords with the prevailing view of other courts that have considered the question. To give one example, the Ninth Circuit held that a defendant was arrested "inside his residence" for purposes of Payton when police "surrounded [his] trailer with their guns drawn, and ordered [him] to come outside," and that subsequent consent by the defendant and his wife to search their trailer was therefore not voluntary (United States v Al-Azzawy, 784 F2d 890, 891-895 [9th Cir 1985]). Other courts have found Payton violations in similar circumstances (see United States v Saari, 272 F3d 804, 808-809 [6th Cir 2001] [*4][defendant's warrantless arrest "was accomplished while he was in his home" and thus violated Payton where "officers surrounded the house, flooded it with spotlights and summoned the defendant with a bullhorn"]; United States v Maez, 872 F2d 1444, 1449-50 [10th Cir 1989] [police "surrounded the (defendant's) trailer, and with guns pointed at the home, asked him and his family to come out"]; United States v Nora, 765 F3d 1049, 1054 [9th Cir 2014] [defendant was arrested " 'inside' his home for purposes of the Payton rule" where police "surround(ed the defendant's) house and order(ed) him to come out at gunpoint"]; Sharrar v Felsing, 128 F3d 810, 819-820 [3d Cir 1997] [SWAT team surrounded the defendant's home with guns pointed at the windows and ordered the defendant to leave the house]; Maloney v County of Nassau, 623 F Supp 2d 277, 288 [EDNY 2007] [citing "ample authority" "recogniz(ing) a Payton violation in the absence of a warrantless physical intrusion into the home"]; cf. United States v Allen, 813 F3d 76, 79 [2d Cir 2016] [arrest violated Payton where officers knocked on defendant's door and told him "he would need to come down to the police station to be processed"]; State v Holeman, 103 Wash 2d 426, 429, 693 P2d 89, 91 [1985] ["A person's home can be invaded to the same extent when the police remain outside the house and call a person to the door as when the police physically enter the household itself"]; State v Dahl, 323 Or 199, 209, 915 P2d 979, 986 [1996] ["Permitting the police, without a warrant . . . to seize a person inside his house by ordering that person to emerge from his house would be inconsistent with (Payton's) well-established constitutional principle"]).
Nor do we share the dissent's view that courts are meaningfully divided over whether Payton prohibits police from compelling a defendant to leave their home (see dissenting op at 17). To be sure, several federal circuit courts have held that warrantless arrests do not violate Payton where officers simply knock on a defendant's door and ask them to come outside. But such "knock and talk" encounters are distinct from the use of coercive tactics to force a defendant out of the home (see United States v Thomas, 430 F3d 274, 278 [6th Cir 2005] [distinguishing a consensual "knock and talk" visit from an encounter where "police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home"]; Knight v Jacobson, 300 F3d 1272, 1278 n 5 [11th Cir 2002] [acknowledging "(s)ome courts have held that when the suspect leaves his home because of coercive tactics by the police, the arrest is illegal," but finding "no such tactics in this case"]). Both United States v Berkowitz (927 F2d 1376, 1380 [7th Cir 1991]) and United States v Carrion (809 F2d 1120, 1123 [5th Cir 1987]), cited by the dissent (see dissenting op at 17 n 6), involved warrantless arrests at the doorway of a defendant's home, after police knocked on the defendant's door and the defendant voluntarily opened it, rather than allegations of constructive entry.
Our conclusion is also fully consistent with this Court's precedent. We have permitted warrantless arrests where a defendant voluntarily comes to the doorway or exits their home, but those cases did not involve coercive police conduct. For example, People v Garvin involved a simple knock at the door and included no allegation of coercion (30 NY3d 174 [2017]). We expressly noted that we were bound by the Appellate Division's finding that the defendant "voluntarily emerged" from the home (id. at 184), and effectively reserved the question presented here by flagging that "defendant does not ask us to apply the constructive entry rule in this case" (id. at 183 n 7). The cases Garvin cites similarly involved "noncoercive" police tactics (id. at 181, citing People v Spencer, 29 NY3d 302 [2017]; People v Reynoso, 2 NY3d 820 [2004]; People v Roe, 73 NY2d 1004 [1989]; and Minley, 68 NY2d 952), and the warrantless arrests in those cases did not run afoul of Payton for that reason. Nothing in these cases decides, or even directly bears on, the question before us today.
As for the protection conferred by the State Constitution, we explained in People v Harris (77 NY2d 434 [1991]) that in light of the interplay between the state's right to counsel rules and search and seizure provisions, the State Constitution provides even more robust protections against Payton violations than the [*5]Fourth Amendment. Accordingly, we conclude that the State Constitution encompasses a theory of constructive entry as well.[FN2]C.
Although some cases may present a close question as to the line between voluntariness and coercion, we have no trouble upholding the Appellate Division's conclusion that a Payton violation occurred in this case. Because the Appellate Division's determination that the defendant was coerced to leave the apartment presents a mixed question of law and fact (see Garvin, 30 NY3d at 184), our review is limited to ascertaining whether there is record support for the Court's determination that the "defendant's exit from the residence was a mere submission to a claim of lawful authority . . . rather than a voluntary exit" (229 AD3d at 1184 [internal quotation marks omitted]; see also Spencer, 29 NY3d at 312).
We conclude that the record amply supports the Appellate Division's determination that the defendant was coerced out of the apartment. The building was surrounded by more than a dozen SWAT team officers dressed in tactical gear and carrying assault rifles. There was an armored SWAT vehicle on the premises. An officer, upon seeing the defendant in the window, ordered him to "come out empty handed and come out with your hands up" and told him that the building was "surrounded." In the face of this overwhelming show of authority by police, no reasonable person would have felt free to ignore the officer's command to exit the home. We therefore conclude the defendant's arrest was unlawful under both the Fourth Amendment and article I, section 12 of the New York Constitution.III.
A.
Notwithstanding its conclusion that the defendant's arrest violated Payton, the Appellate Division found that suppression of the gun discovered inside the apartment was not necessary because "a tenant's valid consent can attenuate any initial illegality in the constructive entry" and, here, "the tenant's consent was voluntarily given" (229 AD3d at 1184 [quotation marks and brackets omitted]). As we explain, see infra Point III.B., the Appellate Division erred by failing to distinguish between voluntariness and attenuation and by applying the wrong factors in assessing the voluntariness of the tenant's consent. A threshold question, though, is whether attenuation analysis applies at all where a third party, rather than a defendant, provides consent to search.
We assumed as much in Matter of Leroy M. (16 NY3d 243 [2011]). Noting the parties' stipulation that a third party's consent to search a home was voluntary, the Court proceeded to analyze whether the consent was sufficiently attenuated from the prior illegal entry into the home and concluded it was (see id. at 246-247). Although we did not explicitly hold that attenuation analysis may apply to a third party, there would have been no reason to examine the question if the Court thought otherwise (see also People v Banks, 85 NY2d 558, 563 [1995] [suppressing evidence discovered following a traffic stop because a third party's consent was not "acquired by means sufficiently distinguishable from the taint of illegal detention"]).
That understanding comports with the purposes of the exclusionary rule: to "deter[] lawless conduct by [police] officers" and to "clos[e] the doors of the [] courts to any use of evidence unconstitutionally obtained" (Brown v Illinois, 422 US 590, 599 [1975], quoting Wong Sun v United States, 371 US 471, 486 [1963]). Permitting a police officer to use evidence discovered after entering a home in violation of Payton so long as they subsequently obtain consent from a third party could incentivize officers to violate Payton without repercussion anytime there are two people in a home, by simply asking for consent from the third party. We thus decline to create a categorical rule, as the dissent would, that a defendant's unlawful arrest can never taint the consent of a third party.
Our conclusion is consistent with the decisions of numerous federal circuit courts and state high courts that have considered whether a third party's consent was sufficiently attenuated from prior illegality when ruling on a suppression motion. For example, in United States v Oaxaca, the Ninth Circuit explained that "[c]onsent by a defendant or a third party is tainted where the evidence indicates that it stemmed from the prior illegal Government action" (233 F3d 1154, 1158 [9th Cir 2000]). Similarly, in State v Lane, the Supreme Court of Iowa analyzed, in painstaking detail, whether a third party's voluntary consent was obtained by "exploitation" of the illegal entry and arrest of the defendant, ultimately concluding that the consent was sufficiently attenuated from this prior illegality (see 726 NW2d 371, 380-392 [Iowa 2007, plurality op]; see also United States v Maez, 872 F2d 1444, 1453—1456 [10th Cir 1989][FN3]; United States v Valentine, 539 F3d 88, 91, 96 [2d Cir 2008]; United States v Vega, 221 F3d 789, 801 [5th Cir 2000]; People v Boyer, 38 Cal 4th 412, 447, 133 P3d 581, 607 [2006]; State v Miller, 894 SW2d 649, 654-656 [Mo 1995]; Milam v Commonwealth, 483 SW3d 347, 352 [Ky 2015]). We see no reason to deviate from this prevailing view.
Rather than address third party consent head-on, the dissent contends that New York v Harris (495 US 14 [1990]) bars application of the exclusionary rule here, relying on a passage which holds that attenuation analysis should not be employed where evidence is obtained "outside of [a defendant's] home . . . after an arrest made in the home in violation of Payton" (dissenting op at 8, citing Harris, 495 US at 21). This argument was not presented to the Court, and the People's brief does not cite Harris. In any event, Harris does not preclude application of attenuation here. The Supreme Court emphasized in Harris the distinction between a statement made outside the home, at the station house, and "evidence found, or statements taken, inside the home" (Harris, 495 US at 20). The station house statement was not subject to exclusion, but "the principal incentive to obey Payton still obtains: the police know that a warrantless entry will lead to the suppression of any evidence found, or statement taken, inside the home" (id.). People v Jones (2 NY3d 235 [2004]), which declined to suppress identifications secured through a line-up conducted five hours after an unlawful entry into a home, presumably at the station house, tracks that approach. Here, by comparison, the evidence subject to exclusion — the gun — was discovered inside the home, and that is precisely what Payton protects. Moreover, the Supreme Court's determination that attenuation analysis was unnecessary in Harris does not resolve whether attenuation is appropriate when a Payton violation occurs through constructive entry, which necessarily involves coercing a defendant to exit the home. Under those circumstances, evidence or consent obtained just outside the home, and immediately following the Payton violation, could be an exploitation of the illegal constructive entry and resulting exit. If Payton encompasses constructive entry, as we hold it does, it seems unlikely that Harris — a case that did not involve constructive entry — would somehow preclude relief on that basis. Nor do we see anything in [*6]Harris that requires us to treat consent obtained from a third party differently than consent from a defendant.
Attenuation analysis is also required under the State Constitution. As we explained on remand from the Supreme Court in Harris, the Supreme Court's ruling regarding the scope of the exclusionary rule under federal law "is not adequate to protect New York citizens from Payton violations because of our right to counsel rule" (77 NY2d at 439). In contrast to federal law, under New York law "police are prohibited from questioning a suspect after an arrest pursuant to a warrant unless counsel is present" and therefore "have every reason to violate Payton . . . because doing so enables them to circumvent the accused's indelible right to counsel" (id. at 440). That is exactly what happened here. Allowing police to coerce a defendant out of the home in violation of Payton and then, in the absence of counsel, seek consent to search the home, could surely put the police "in a better position than they would have been in if no illegality had transpired" (Jones, 2 NY3d at 242 [internal brackets omitted]). That the consent was provided by a third party here does not obviate these concerns [FN4]. Thus, under these circumstances, we believe an additional layer of protection against unlawful police entry into the home, in the form of attenuation analysis, is appropriate. Providing this safeguard under the State Constitution is, as then-Judge Kaye once said, a "perfectly respectable and legitimate thing to do" (People v Scott, 79 NY2d 474, 505 [1992] [Kaye, J., concurring]). As has been true for decades, "our objective has been the protection of fundamental rights, consistent with our Constitution, our precedents and own best human judgments in applying them" (id. at 506 [Kaye, J., concurring]).B.
Here, the Appellate Division applied an incorrect legal standard in considering the validity of the tenant's consent. People v Gonzalez (39 NY2d 122, 128-130 [1976]) sets forth the factors that should be considered in determining whether the consent was voluntary. Those include "whether the consenter is in custody or under arrest"; "the circumstances surrounding the custody or arrest," including whether the person was "confronted by a large number of police agents"; whether the person was handcuffed; "the background of the consenter," including their age and prior experience with police; "whether the consenter has been . . . evasive or uncooperative with the law enforcement authorities"; and "whether [the person] was advised of [their] right to refuse to consent" (id.). The Appellate Division instead recited and applied the factors set forth in People v Borges (69 NY2d 1031, 1033 [1987]), which go to whether voluntary consent was attenuated from an illegal arrest, not whether the consent itself was voluntary [FN5].
The Appellate Division erred in applying the attenuation factors from Borges rather than the voluntariness factors set forth in Gonzalez in determining that the tenant's consent was voluntary. Voluntariness and attenuation, though related, are separate inquiries that turn on distinct considerations. [*7]The Appellate Division should have the opportunity to assess the voluntariness of the defendant's consent under the correct legal standard in the first instance.[FN6]C.
As the People concede, suppression of the gun would require dismissal of count nine of the indictment. That count of criminal possession of a weapon in the second degree stems from the defendant's possession of the gun that was discovered at the apartment on the date of his arrest, and there was no other evidence presented to support this charge. Any potential error regarding suppression of the gun would be harmless, however, as to all remaining counts of the indictment. Those counts—for murder in the first degree, attempted murder in the second degree, assault in the first degree, and criminal possession of a weapon in the second degree—all stem from the shooting incident. The evidence of the defendant's guilt, including two eyewitness identifications, a magazine from a handgun with the defendant's palm print on it, shell casings and projectiles from a 9-millimeter handgun, and an empty box for a 9-millimeter handgun with the defendant's fingerprints on it, was overwhelming with respect to those charges. We conclude that there is "no reasonable possibility" that any potential error "might have contributed to defendant's conviction[s]" on those counts (People v Crimmins, 36 NY2d 230, 237 [1975]).
We therefore remit to the Appellate Division to consider whether the gun should be suppressed, under the correct legal standard for determining the validity of the tenant's consent, with respect to count nine only.
Accordingly, the order of the Appellate Division should be modified by remitting the case to the Appellate Division for further proceedings in accordance with this opinion and, as so modified, affirmed.

SINGAS, J. (dissenting):

I agree with the majority that the crux of this appeal is the validity of the tenant's consent to search her home for the murder weapon defendant secreted there. I disagree with, but could tolerate, my colleagues' decision to remit to the Appellate Division to reexamine their express finding that the consent was voluntary. However, I cannot abide the majority breaking new ground on issues not raised or briefed.
The majority complicates a straightforward consent analysis and unnecessarily reaches to introduce a new, and heretofore undeveloped, area in New York search and seizure jurisprudence: constructive Payton violations. The majority then declares: "the State Constitution encompasses a theory of constructive entry as well" (majority op at 10). Our State Constitution should not be used to insulate this Court's decisions from U.S. Supreme Court review without an independent substantive analysis identifying the source of the right.
Moreover, to reach this result, the majority must manufacture a connection between the alleged police illegality in arresting defendant in a home where he was an overnight guest and a third party's consent to search her home. But applying the exclusionary rule under such circumstances directly contravenes binding Supreme Court Fourth Amendment precedent, and any argument that the State Constitution mandates a different result is both plainly unpreserved and meritless. Simply stating its mere "belie[f]" that the State Constitution provides an "additional layer of protection" (majority op at 15), the majority does not acknowledge that this holding represents a startling change in the interpretation of our State Constitution. The majority's invocation of the New York Constitution and its extraordinary [*8]broadening of our jurisprudence is legally unsound and marks a significant departure from the principles of judicial restraint that animate our work. I dissent.I.
Defendant was arrested for brutally murdering two victims and paralyzing a third. Before trial, defendant moved to suppress statements made following his arrest, as well as a firearm that police recovered during their subsequent search of the tenant's apartment. Defendant argued that his arrest was unlawful under Payton v New York (445 US 573 [1980]), and that his statements and the subsequent search of the apartment—which he had standing to challenge as an overnight guest—were tainted by that unlawful arrest. 
The evidence elicited at the suppression hearing established the following relevant facts: After a police investigation into a double homicide resulted in positive identifications of defendant, police began actively searching for him. Five days before his arrest—and almost a month after the shooting—police recovered surveillance video from a convenience store showing defendant carrying what appeared to be a handgun. Police subsequently learned that defendant was in the area of the apartment and responded. Dressed in full riot gear, they surrounded the home and broke through a fence enclosure with an armored vehicle. Police shouted for defendant to exit the home with his hands up. He exited three minutes later, holding a bottle of liquor and smoking a cigarette. While defendant was being arrested, officers detained the apartment's tenant, escorted her outside, and informed her what defendant had done. Distraught that defendant had murdered two acquaintances and eager to ensure that no weapons were in her home, the tenant began crying, "hugged [the officer] at several different times," and "jumped at the opportunity," giving verbal and written consent to the police to enter and search her home. The tenant testified for the People at the suppression hearing that, in giving that consent, she "was not intimidated, nor . . . coerced or promised anything to give her consent." After obtaining this consent, the police recovered the murder weapon from the toilet tank in the tenant's bathroom. 
Based on this evidence, County Court held that defendant lacked standing to challenge the search of the tenant's apartment. Alternatively, the court held that the tenant had voluntarily consented to the search, rendering it lawful. With respect to the Payton issue, County Court held that no hearing was necessary because the evidence at the suppression hearing established that defendant was arrested outside the apartment. Following trial, the jury found defendant guilty of the murders and related charges.[FN1] Defendant appealed.
The Appellate Division held that County Court properly denied suppression (see 229 AD3d 1180 [4th Dept 2024]). The Court first concluded that defendant had standing to challenge the search and his arrest as an overnight guest in the apartment (id. at 1183-1184). The Court held that defendant's arrest violated Payton because "the number of officers, their attire in tactical SWAT gear, and their manner of entry" constituted "coercive circumstances suggesting that defendant was submitting to authority by leaving the apartment" (id. at 1184 [internal quotation marks omitted]). But, stating that "a tenant's valid consent can attenuate any initial illegality" of the Payton violation, the Appellate Division concluded that "the tenant's consent was voluntarily given" and that suppression was not required (id. at 1184-1185 [internal quotation marks and brackets omitted]). II.
Against this backdrop, the majority correctly concludes that defendant has standing to challenge the tenant's consent to search (see majority op at 5-6). But the majority holds that the Appellate Division applied the wrong factors to analyze the voluntariness of the tenant's consent and remits that question to the Appellate Division (see majority op at 15-16). This remittal is unnecessary, but relatively harmless. The majority also holds for the first time—with little reasoning and contrary to binding precedent—that a Payton [*9]violation against defendant could have tainted the tenant's consent, and attenuation analysis is thus required to assess whether the evidence seized in her home may be used at trial against defendant (see majority op at 11-15). Despite this erroneous holding, the majority then fails to analyze attenuation, apparently also remitting this issue to the Appellate Division for reasons unknown. This flawed attenuation analysis is a byproduct of the majority's desire to recognize a new type of Payton violation.A.
The Appellate Division expressly found that the tenant's consent was voluntary based on facts germane to the voluntariness analysis insisted upon by the majority (see majority op at 15-16, citing People v Gonzalez, 39 NY2d 122, 128-130 [1976]). As the Court alluded to, the officer testified that before he asked for the tenant's consent, he explained that defendant was being investigated for murdering two people she knew and may have hidden the gun in her home. In response, the tenant began crying, "hugged [the officer] at several different times," and "jumped at the opportunity" to consent. The majority understandably takes issue with the Appellate Division's citation to People v Borges (69 NY2d 1031 [1987]), and the factors relevant to an attenuation analysis when discussing voluntariness (majority op at 16). But reading the Appellate Division's decision as a whole, the Court clearly relied on the voluntariness factors sanctioned by the majority, and its finding of voluntariness is supported by the record despite the "incorrect language" discussing attenuation (People v Sanchez, 32 NY3d 1021, 1023 [2018]). Indeed, the Appellate Division found that the officers
"took time to inform the tenant about the situation, and the evidence at the suppression hearing established that they were expressing a belief that a gun might be in the residence and did not intentionally mislead her into giving consent to search. Moreover, at the hearing, the tenant testified for the prosecution that she voluntarily consented to the search out of a desire to have a gun removed from her residence, where a minor child resided. The tenant never [*10]claimed, in or out of court, that her consent to search was anything but voluntary, and we reject defendant's contention that the tenant's testimony at the hearing is unworthy of belief" (229 AD3d at 1184-1185 [internal quotation marks, citation, and brackets omitted]).
The majority does not dispute that these facts provide ample record support for the voluntariness finding (see Gonzalez, 39 NY2d at 128-131; see also Fernandez v California, 571 US 292, 307 [2014]). Sending this case back for an analysis that the Appellate Division already conducted is a pointless exercise, and I am unsure of how the substance of its analysis will change upon remittal.B.
Regardless of whether we should affirm or remit on the voluntariness issue, one thing is certain: this appeal should begin and end there because any illegality in defendant's arrest bears no connection to the tenant's consent. The majority forgoes substantive analysis to hold that the tenant's consent must be attenuated from a Payton violation against defendant (see majority op at 11-15). Applying the exclusionary rule in this manner is directly contrary to binding Supreme Court precedent, and any such argument under the New York State Constitution is both unpreserved and meritless.1.
"[A]ttenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the product of illegal governmental activity' " (New York v Harris, 495 US 14, 19 [1990], quoting United States v Crews, 445 US 463, 471 [1980]; see People v Arnau, 58 NY2d 27, 32, 34 [1982] ["the defendant . . . has the burden of showing that the seizure of the evidence was causally related to the illegal police conduct. . . . [W]here this causal nexus is lacking, the exclusionary rule simply does not apply"]). In Borges, as in the vast majority of cases considering the attenuation of consent from a prior illegal arrest, the person being arrested and the person consenting were one and the same (69 [*11]NY2d at 1032-1033; People v Henley, 53 NY2d 403, 407-408 [1981]; People v Bradford, 15 NY3d 329, 333-334 [2010]; see also Brown v Illinois, 422 US 590, 604 [1975]). When a defendant provides consent while in custody following their arrest without probable cause, the nexus is often self-evident (see e.g. Borges, 69 NY2d at 1033; Henley, 53 NY2d at 407-408), because "the wrong consists of the police's having control of the defendant's person at the time" the challenged evidence was obtained (Harris, 495 US at 19, quoting People v Harris, 72 NY2d 614, 625 [1988, Titone, J., concurring]). 
However, the inquiry is different for Payton violations than for arrests unsupported by probable cause, because the nature of the illegality is different. When the police have probable cause to arrest a suspect and do so in the home without a warrant, the question is whether the evidence is the "fruit of having been arrested in the home rather than someplace else" (id. at 19; see also People v Jones, 2 NY3d 235, 244 [2004]). As the Supreme Court explained in Harris, the inquiry is a narrow one in this context because "continued custody of the suspect once he is removed from the house" is lawful (id. at 18; see United States v Montalvo-Murillo, 495 US 711, 722 [1990] ["an unlawful arrest does not require a release and rearrest to validate custody, where probable cause exists"]; see also United States v Watson, 423 US 411, 415 [1976] [warrantless arrest outside the home founded on probable cause does not violate the Fourth Amendment]). Harris therefore held that the exclusionary rule does not apply, and thus attenuation analysis is improper, where evidence is acquired from "the defendant outside of [their] home, even though the [evidence] is taken after an arrest made in the home in violation of Payton" (Harris, 495 US at 21). In light of this holding, Harris reversed our Court for erroneously conducting an attenuation analysis when a defendant, unlawfully arrested inside the home in violation of Payton, signed a written statement confessing to the crime at the police station (see id. at 15-16, 19). Harris is clear: once a defendant is outside the home, the specific right that Payton addresses is no longer implicated.[FN2]
The majority dismisses our analysis of Harris (see majority op at 13-14). But this Court and courts around the country have consistently interpreted its rule. In People v Jones, we explained that Harris held that "evidence procured after the police leave an arrestee's residence is not considered to be 'the product of' a Payton violation" (Jones, 2 NY3d at 240, quoting Harris, 495 US at 19). So too have other federal and state courts explained that the exclusionary rule simply does not apply to evidence obtained outside of the home following an arrest supported by probable cause but in violation of Payton (see e.g. Mosby v Senkowski, 470 F3d 515, 521 [2d Cir 2006]; United States v Stamper, 91 Fed Appx 445, 455 [6th Cir 2004]; United States v Crawford, 372 F3d 1048, 1056 [9th Cir 2004]; United States v Villa-Velasquez, 282 F3d 553, 556 [8th Cir 2002]; United States v Dickerson, 27 Fed Appx 236, 243 [4th Cir 2001]; United States v Duchi, 944 F2d 391, 395 [8th Cir 1991]; State v Felix, 2012 WI 36, ¶ 27, 339 Wis 2d 670, 688, 811 NW2d 775, 784 [2012]; Oxner v United States, 995 A2d 205, 208 [DC 2010]; Edwards v State, 107 Nev 150, 155, 808 P2d 528, 531 [1991]). 
The majority's claim that its exclusionary rule analysis coheres with the "prevailing view" (majority op at 13) is unsupported. Of its two citations involving a third-party consent following a Payton violation, one provides no reasoning on this issue and involves a defendant and a third party who were both inside the home at the time of consent (see United States v Oaxaca, 233 F3d 1154, 1158 [9th Cir 2000]); the other preceded Harris, and its attenuation holding has seemingly been abrogated as it relates to evidence obtained outside the residence following a Payton violation (see United States v Maez, 872 F2d 1444, 1453-1456 [10th Cir 1989]; Walters v State, 108 Nev 186, 188-189, 825 P2d 1237, 1239 [1992] [withdrawing earlier opinion relying on Maez in light of Harris]). None of the remaining cases the majority cites even arise in the Payton context, and nearly all provide no reasoning (see United States v Valentine, 539 F3d 88, 96 [2d Cir 2008] [no reasoning; not a Payton violation]; Milam v Commonwealth, 483 SW3d 347, 352 [Ky 2015] [no reasoning; not a Payton violation]; People v Boyer, 38 Cal 4th 412, 447, 144 P3d 581, 607 [2006] [no [*12]reasoning; not a Payton violation]; State v Miller, 894 SW2d 649, 654-656 [Mo 1995]; [no reasoning; not a Payton violation]; United States v Vega, 221 F3d 789, 801 [5th Cir 2000] [not a Payton violation]).[FN3]
The majority theorizes, without legal support, that attenuation analysis is required because the tenant's consent, given while outside the home, may somehow be tainted by the constructive Payton violation against defendant. Courts that have adopted the theory of "constructive entry" reason that, though law enforcement has not physically entered a suspect's home, their coercive actions from outside the home have nonetheless amounted to a seizure of the suspect inside the home (see United States v Reeves, 524 F3d 1161, 1167-1169 [10th Cir 2008]). Thus, even if police have not physically entered the home, if they have seized the suspect and directed their exit, this is no different from entering the home without a warrant and physically removing the suspect (see id.). To state the obvious, constructive entry is an "entry" because officers intrude into the home; it is "constructive" because they have done so without physically crossing the threshold.Given constructive entry's theoretical underpinnings, Harris should apply no differently because the Payton violation—whether physical or constructive—ceases "once [the suspect] is removed from the house" (Harris, 495 US at 18). At no point does the majority even attempt to explain how constructively arresting defendant could have been exploited to obtain the tenant's later consent, given outside the home and in response to information the officers provided, much less how suppression would result in any [*13]meaningful deterrence here (see Harris, 495 US at 20 [exclusionary rule inapplicable because "the incremental deterrent value would be minimal"]; Jones, 2 NY3d at 244 [exclusionary rule inapplicable because suppression would have "a minimal impact"]). Instead, it states that Harris requires attenuation analysis because the gun "was discovered inside the home" (majority op at 14). The majority fails to mention that, as County Court found, the gun was not discovered during or due to defendant's arrest while inside the apartment—which might warrant attenuation analysis—but pursuant to the tenant's later voluntary consent to search the apartment. The gun's location in the home is thus irrelevant in this case for purposes of applying the exclusionary rule. The majority surely cannot think that Harris requires courts to conduct attenuation analysis every time there is a Payton violation, and police later legally enter the home and discover evidence.
The only logical conclusion—and the one mandated by Harris—is that constructively entering the home to arrest defendant did not put officers in a better position to obtain the tenant's consent outside the home. Under the Fourth Amendment, attenuation analysis would be improper even if the defendant himself had consented to a search after his removal from the home because police had probable cause to arrest him. How, then, could a third party's consent be subject to attenuation analysis following a Payton violation against a defendant where both the defendant and the third party were outside the residence at the time of consent? There is no basis to conclude that the tenant would have refused consent had defendant been instead arrested outside the home. Rather, it is the information provided by officers—none of which was obtained because of defendant's arrest—that appears to have induced the tenant's consent. The third-party tenant's consent in this case simply bears no relationship to any Payton violation against defendant, and the exclusionary rule is inapplicable. In sum the majority stakes out a fringe position by applying the exclusionary rule here rather than following the "prevailing view" (majority op at 13).2.
After stretching Harris beyond recognition and stripping it of its fundamental holding, the majority turns to the New York Constitution for support, but finds none (see majority op at 14-15). Defendant never argued below that the State Constitution offers greater protections than the Fourth Amendment in this context and provided only a bare parallel citation below.[FN4] This argument is therefore clearly unpreserved, as we have held under identical circumstances (see People v Garvin, 30 NY3d 174, 185 n 8 [2017] ["Any issues regarding whether New York Constitution, article I, § 12 provides greater protection . . . are unpreserved here because . . . defendant did not argue that the State Constitution provides greater protections than its federal counterpart to defendants subject to warrantless arrests in the home"]; see also People v Gordon, 36 NY3d 420, 434 n 3 [2021] ["Although Mr. Garvin included a bare parallel citation to the State Constitution, he did not argue that there were any substantive differences between New York and federal law and his arguments focused solely upon the proper interpretation and application of the federal rule. . . . (Thus,) Mr. Garvin had not preserved any independent argument under New York law"]; People v Hansen, 99 NY2d 339, 345 n 4 [2003]). The majority cannot ignore preservation simply because it is inconvenient.
In any event, the majority's imprudent reliance on our State Constitution is misplaced. As this Court acknowledged on remand in Harris, the "similar language" and "common history" of federal and state search and seizure protections means that "[i]f a distinction is to be made in what they require . . . it must rest on a noninterpretive analysis of the State provision in which the Court focuses not on the text of the clause but on matters peculiar to this State" (Harris, 77 NY2d at 438). Following these tenets, we held that the Fourth Amendment's exclusionary rule was "not adequate to protect New York citizens from Payton violations because of our right to counsel rule" (id. at 439). Because the state right to counsel—unlike its federal counterpart—attaches upon issuance of an arrest warrant, allowing the use of a suspect's statements [*14]made following a Payton violation would "enable[ ] [police] to circumvent the accused's indelible right to counsel" (id. at 440). By contrast, in Jones, we saw no need to deviate from the federal rule where a defendant was subjected to a police-station lineup after a Payton violation given that "the benefits of counsel's presence at a lineup are more limited than at an interrogation" (2 NY3d at 243). We thus held that the exclusionary rule did not apply, and attenuation analysis was unnecessary (see id. at 244-245). As Harris and Jones demonstrate, when this Court has deviated from the Fourth Amendment in interpreting the similar language of article I, § 12, it has supported that decision by precisely and cautiously delineating the specific state peculiarities mandating that result. The majority expands our law, invoking the State Constitution without following the framework we have painstakingly set out.
The majority acknowledges that Harris only authorized a departure from federal law due to New York's greater right to counsel protections, but contends that a third party's consent should be treated no differently under this rule (see majority op at 14-15). How can this be, when the third party's right to counsel is not implicated? The majority does not explain further, but declares that "an additional layer of protection against unlawful police entry into the home, in the form of attenuation analysis, is appropriate" because these circumstances "could surely put the police 'in a better position than they would have been in if no illegality had transpired' " (majority op at 15, quoting Jones, 2 NY3d at 242). How so remains a mystery; there is simply no connection between the Payton violation and the third party's consent. Indeed, because it collapses the nexus and attenuation inquiries, the majority's rule has no real limits and would treat evidence far removed from any illegality—such as the consent of a third-party roommate who consents a block away from the home, or several days after the Payton violation—as presumptively tainted.C.
The majority's attenuation analysis is mistaken, but even accepting its flawed logic, the proper course would be to review the attenuation finding for record support (see People v Conyers, 68 NY2d 982, 984 [1986]). We cannot remit to the Appellate Division to reconsider this issue without identifying some [*15]legal error in its analysis. The majority fails to identify any error and thus remits on attenuation for reasons unknown and without any jurisdictional basis to do so. 
Nor does the majority's half-hearted attempt to justify why its convoluted maneuver is "appropriate" help matters (majority op at 10 n 2). The majority claims that it must begin by "determining whether there was an initial illegality here—that is, a Payton violation" (majority op at 10 n 2). And despite conceding that "involuntariness of consent can be an independent basis for suppression," the majority apparently remits on attenuation because "the question of voluntariness arises here in the context of an attenuation analysis, which is only 'appropriate where, as a threshold matter, courts determine that the challenged evidence is in some sense the product of illegal governmental activity' " (majority op at 10 n 2, quoting Harris, 495 US at 19). 
Respectfully, this makes no sense. Attenuation and voluntariness are distinct inquiries, and the question of voluntariness arises because the consent is the basis for the police conducting the search inside the premises, regardless of any prior illegal police action. If the majority is asserting that some other "illegal governmental activity" must be shown (here, a Payton violation) before turning to voluntariness, it is significantly abridging criminal defendants' Fourth Amendment rights in defiance of binding precedent from the Supreme Court (see Bumper v North Carolina, 391 US 543, 548 n 11 [1968]). The majority's brief explanation for the necessity of its novel holdings crumbles under minimal scrutiny.D.
The majority's unsupported remittal on attenuation leads the majority to another novel holding—the one that appears to be the driving force behind its opinion—that physical entry into the home is not required to show a Payton violation where coercive circumstances rise to a "constructive entry" into the home (majority op at 6). 
Until today, this Court has never recognized a constructive Payton violation. We have instead consistently framed Payton as prohibiting police officers from physically entering the home.[FN5] Recently this Court concluded in People v Garvin that no Payton violation occurred where, in response to plainclothes officers knocking on his door, the defendant opened his door and was arrested in the threshold of his doorway (see 30 NY3d at 178). In summarizing our case law, we observed that, "[c]ritically, the police never entered the defendants' homes in these cases and, thus, the intrusion prohibited by Payton did not occur" (id. at 182). Although we wisely exercised judicial restraint to avoid unnecessarily resolving the constructive Payton issue, we expressed strong skepticism towards doing so (see id. at 182 n 6, 183 n 7). Indeed, courts have been divided over the existence of constructive Payton violations, and among those courts that have acknowledged them, there is no consensus on how the analysis should proceed.[FN6] The majority's brief "magic words" referencing the State Constitution should not be used to avoid Supreme Court review without meaningful analysis (see Yvonne Kauger, Reflections on Federalism: Protections Afforded by State Constitutions, 27 Gonz L Rev 1, 13 [1992]; see also Michigan v Long, 463 US 1032, 1042 [1983]).Regardless, the majority's new constructive Payton rule is neither clear nor practical. The majority states that "subject[ing] someone to a display of authority that induces them to exit the home under coercion" violates Payton (majority op at 6). But because the majority also anchors the test to whether a defendant "would have felt free to ignore the officer's command to exit the home" (majority op at 11), it is unclear what it means by "display of authority." The majority claims that its standard would not recognize a Payton violation where a resident, based upon the authority projected by a police officer's uniform, is convinced that they must come to the door to speak with that officer (see majority op at 8-9; see also Garvin, 30 NY3d at 181), but it is not clear why that would be so based on the majority's loose "display of authority" language.[FN7]III.The imprecision pervading the majority opinion demonstrates the importance of exercising judicial restraint. Waiting for a proper case would undoubtedly facilitate and sharpen the Court's analysis of these questions.
"Courts often decide questions on narrow grounds and reserve harder issues for another day. . . . Such judicial modesty is especially prudent where an issue has not been fully subjected to the crucible of the adversarial process and there is a sufficient alternative ground for deciding the case. Thus, the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to [*16]decide more—counsels us to go no further. Anything more is a gratuitous ride, and one that I would not embark upon here" (Hobish v AXA Equit. Life Ins. Co., 43 NY3d 442, 461 [2025, Halligan, J., concurring] [internal quotation marks and citations omitted]).
Here, the exclusionary rule is not implicated under binding Supreme Court precedent, and the majority tacitly agrees that any deviation from the federal standard based on our State Constitution is unpreserved. Recognition of constructive Payton violations is therefore unnecessary. Without being asked to do so, the majority embarks on an unnecessary expansion of our State Constitution. Basic principles of judicial restraint counsel leaving these questions for another day.Neither the Appellate Division memorandum nor some of this Court's own opinions are a model of clarity, and it is this Court's responsibility to offer cautious and well-reasoned guidance to clear up this murky area of law for litigants and our colleagues on the bench. In Harris, Judge Titone remarked that in "the absence of guidance from this court on the issue will continue to lead to analytical problems in future Payton cases" (72 NY2d at 626 [Titone, J., concurring]). The majority's opinion proves him right and further obfuscates these issues, dragging this Court deeper into the murk. 
I dissent.
Order modified by remitting to the Appellate Division, Fourth Department, for further proceedings in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Halligan. Chief Judge Wilson and Judges Rivera and Troutman concur. Judge Singas dissents in part and votes to affirm in an opinion, in which Judges Garcia and Cannataro concur.
Decided February 19, 2026

Footnotes

Footnote 1: The Appellate Division also modified the judgment of County Court to dismiss the two counts of murder in the second degree as lesser included offenses of murder in the first degree, and to direct that the sentences imposed for two of the three counts of criminal possession of a weapon in the second degree run concurrently with the other sentences imposed.

Footnote 2: The dissent takes us to task for determining whether a Payton violation occurred (see dissenting op at 16-19). But the Appellate Division squarely held that "[a]n arrest outside of a residence can . . . constitute a Payton violation," and that such a violation occurred "under the circumstances of this case" (229 AD3d at 1184). Both parties disputed these points before us. In resolving these questions, we are simply addressing an issue presented by this appeal, as it has been litigated below. Although involuntariness of consent can be an independent basis for suppression, the question of voluntariness arises here in the context of an attenuation analysis, which is only "appropriate where, as a threshold matter, courts determine that the challenged evidence is in some sense the product of illegal governmental activity" (New York v Harris, 495 US 14, 19 [1990] [internal quotation marks omitted]). Determining whether there was an initial illegality here — that is, a Payton violation — is therefore an appropriate first step under the circumstances.

Footnote 3: Despite the dissent's assertion that Maez was "seemingly" abrogated by New York v Harris (495 US 14 [1990]) (dissenting op at 10), courts in the Tenth Circuit have continued to treat its holding regarding attenuation as good law (see e.g. United States v McSwain, 29 F3d 558, 563 [10th Cir 1994]; United States v Ramos, 194 F Supp 3d 1134, 1184 [D NM 2016]; United States v Christy, 2011 WL 13285700, *34 [D NM, May 25, 2011, No. CR 10-1534]).

Footnote 4: The consent here was given in front of the house, while the tenant was in the back of a police vehicle, less than ten minutes after the police surrounded the house and ordered her out at gunpoint. Applying attenuation analysis in these circumstances certainly does not suggest it would be warranted "a block away from the home, or several days after the Payton violation" (dissenting op at 15).

Footnote 5: Borges explained that voluntariness is an important but not dispositive factor in the attenuation analysis, and went on to discuss "a variety of factors" that should also be considered, including "the temporal proximity of the consent to the arrest, the presence or absence of intervening circumstances, whether the police purpose underlying the illegality was to obtain the consent or the fruits of the search, whether the consent was volunteered or requested, whether the [person] was aware [they] could decline to consent, and particularly, the purpose and flagrancy of the official misconduct' " (Borges, 69 NY2d at 1033).

Footnote 6: The dissent's view that the Appellate Division applied the correct factors is puzzling (see dissenting op at 5-6). Although the Court noted the tenant's testimony regarding the search, it unquestionably recited the factors for determining attenuation, not voluntariness. Nor is there anything unusual in remitting for that Court to review the facts under the proper framework rather than doing so ourselves in the first instance (see e.g. People v Johnson, 39 NY3d 92, 98 [2022]).

Footnote 1: Defendant was sentenced to life without parole for the murder counts, which the majority affirms because any error as to those counts would be harmless. The majority's remittal only pertains to defendant's weapon possession conviction, which is supported solely by the firearm seized when searching the tenant's home (see majority op at 17).

Footnote 2: We did not hold otherwise in Matter of Leroy M. (16 NY3d 243 [2011]). Leroy M. did not involve a Payton violation, and, in any event, the third-party consent was given while officers were illegally inside the home (see id. at 245). Although the Court proceeded on the assumption that attenuation analysis was proper (see majority op at 11-12 [acknowledging that in Leroy M. "we did not explicitly hold that attenuation analysis may apply to a third party"]), it did not actually reach this issue.

Footnote 3: The Iowa Supreme Court's two-Justice plurality opinion in State v Lane also did not involve a Payton violation (see 726 NW2d 371, 380-392 [Iowa 2007, Cady, J., plurality op]). Moreover, though Lane analyzed the relevant attenuation factors for a voluntary third-party consent "in painstaking detail" (majority op at 12), it never meaningfully analyzed whether attenuation analysis was proper in the first place (see Lane, 726 NW2d at 380-392 [Cady, J., plurality op]). The third Justice making up the quorum in Lane (see Iowa Code § 602.4101), who concurred in the result only, opined that as he agreed with the "conclusion that [the third party's] consent was validly obtained" he would "affirm the judgment of the district court on that narrow ground alone" (id. at 394 [Larson, J., concurring specially]). According to the concurrence, a "search based on consent by [defendant's] cotenant was a large step removed from the garage search" (id.). "In fact, they were unrelated . . . . [C]onsent was not obtained from [defendant]—a scenario that might raise fruit-of-the-poisonous-tree concerns—but [from] a third party" (id.).

Footnote 4: The majority's adoption of a new state constitutional rule without being asked by any party makes its attempted reprimand for my citation to binding Supreme Court precedent that was not in the parties' briefs (majority op at 13) particularly ironic.

Footnote 5: See People v McBride, 14 NY3d 440, 445 (2010) ("It is axiomatic that warrantless entries into a home to make an arrest are presumptively unreasonable" [internal quotation marks and citations omitted]); People v Minley, 68 NY2d 952, 953 (1986) ("Payton . . . prohibits the police from crossing the threshold of a suspect's home to effect a warrantless arrest"); People v Levan, 62 NY2d 139, 144 (1984) ("Under Payton . . . no private dwelling may be entered by the police to arrest its occupant if an arrest warrant has not been obtained"); People v Mahoney, 58 NY2d 475, 479 (1983) ("the evil Payton sought to prevent was the warrantless entry inside a home").

Footnote 6: See Steven B. Dow, "Step Outside, Please": Warrantless Doorway Arrests and the Problem of Constructive Entry, 45 New Eng L Rev 7, 10 (2010) (courts have been "deeply divided over" constructive Payton violations); Steven B. Dow, Muddling Through the Problem of Constructive Entry: Comments on United States v Allen, 813 F3d 76 [2d Cir 2016], and Warrantless Doorway Arrests, 79 U Pitt L Rev 243, 260-262 (2017) ("there is no consensus among the courts on how much weight to place on the various existing factors," such as the "number of officers approaching the dwelling and confronting the occupant" or "presence of a brandished firearm"); see also United States v Berkowitz, 927 F2d 1376, 1386 (7th Cir 1991) ("Payton prohibits only a warrantless entry into the home, not a police[ officer's] use of [their] voice to convey a message of arrest from outside the home"); United States v Carrion, 809 F2d 1120, 1128 (5th Cir 1987) (no Payton violation where agents demanded defendant to exit hotel room at gunpoint from open door).

Footnote 7: Even accepting the majority's constructive Payton test, its merits discussion fares little better. Not even defendant himself claimed that officers coerced him to exit the residence, and while he testified to hearing officers asking or telling him to come out, he did not testify as to how many police officers he observed around the residence, how they were dressed or whether he heard the armored vehicle. When asked on cross-examination whether he "did, on (his) own, go outside," defendant answered, "Yes." According to the majority, "[i]n the face of this overwhelming show of authority by police, no reasonable person would have felt free to ignore the officer's command" (majority op at 11). Yet, defendant did ignore the police, and instead of coming out of the house with his hands up, he defied officers' orders by exiting while holding a bottle of liquor and a cigarette three minutes later. His testimony falls far short of demonstrating that he succumbed to an overwhelming show of force.