People v Jenkins (2023 NY Slip Op 02031)

People v Jenkins

2023 NY Slip Op 02031

Decided on April 20, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 20, 2023

110320
[*1]The People of the State of New York, Respondent,
v
Willie F. Jenkins, Appellant.

Calendar Date:February 16, 2023

Before:Egan Jr., J.P., Clark, Pritzker, Ceresia and Fisher, JJ.

Pamela B. Bleiwas, Ithaca, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (Nathan M. Bloom of counsel), for respondent.

Clark, J.
Appeal from a judgment of the County Court of Chemung County (Christopher P. Baker, J.), rendered January 22, 2018, upon a verdict convicting defendant of the crimes of assault in the first degree, criminal use of a firearm in the first degree, criminal possession of a weapon in the second degree (two counts) and criminal possession of a weapon in the third degree.
During an altercation at a convenience store on April 8, 2017 in the City of Elmira, Chemung County, a man (hereinafter the victim) was shot. Defendant was thereafter charged in a seven-count indictment with attempted murder in the second degree, assault in the first degree, two counts of criminal use of a firearm in the first degree, two counts of criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree. Following a jury trial, defendant was acquitted of attempted murder in the second degree but was found guilty on the remaining counts. However, upon defendant's motion, County Court vacated the conviction of one count of criminal use of a firearm in the first degree, finding that it was repugnant to the verdict because such count required a conviction on the attempted murder count. Defendant was then sentenced, as a second violent felony offender, to concurrent prison terms of 23 years followed by 5 years of postrelease supervision for his convictions of assault in the first degree and criminal use of a firearm in the first degree and to lesser concurrent terms of incarceration on the remaining convictions. Defendant appeals.
Defendant contends that the verdict is legally insufficient and against the weight of the evidence because the proof adduced at trial did not establish his identity as the shooter. "When assessing the legal sufficiency of a jury verdict, we view the facts in the light most favorable to the People and examine whether there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (People v Harris, 203 AD3d 1320, 1321 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 38 NY3d 1033 [2022]; see People v Santiago, 206 AD3d 1466, 1467 [3d Dept 2022]). In turn, when "conducting a weight of the evidence review, we must view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Barzee, 190 AD3d 1016, 1017-1018 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 36 NY3d 1094 [2021]; see People v Martinez, 166 AD3d 1292, 1293 [3d Dept 2018], lv denied 32 NY3d 1207 [2019]).
As relevant here, a person is guilty of assault in the first degree, a class B violent felony when, "[w]ith [*2]intent to cause serious physical injury to another person, he [or she] causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.10 [1]; see Penal Law § 70.02 [1] [a]). "A person is guilty of criminal use of a firearm in the first degree when he [or she] commits any class B violent felony offense as defined in [Penal Law § 70.02 (1) (a)] and he [or she] . . . possesses a deadly weapon, if the weapon is a loaded weapon from which a shot, readily capable of producing death or other serious injury may be discharged" (Penal Law § 265.09 [1] [a]). "A person is guilty of criminal possession of a weapon in the second degree when[,] . . . with intent to use the same unlawfully against another, such person
. . . possesses a loaded firearm" (Penal Law § 265.03 [1] [b]). A person may also be found guilty of criminal possession of a weapon in the second degree when, subject to exceptions not applicable herein, "such person possesses any loaded firearm" (Penal Law § 265.03 [3]). Lastly, "[a] person is guilty of criminal possession of a weapon in the third degree when" he or she possesses a firearm "and has been previously convicted of any crime" (Penal Law § 265.02 [1]; see Penal Law § 265.01 [1]).
On the night of the incident, a male convenience store employee (hereinafter "the male clerk") testified that he was conducting inventory when he began to hear raised voices, and he identified defendant, who was wearing an orange knit hat, as one of the men involved. The male clerk testified that a female clerk — who seemed to know defendant — began to urge the group to step outside the store. According to the male clerk, he also heard a male voice point out the store's surveillance cameras, and the group moved outside. Although he tried to keep an eye on the situation, the male clerk admitted that his view was obstructed by various objects around the store and by a glare on the window. He explained that the store's parking lot was only lit by the store's sign and by the headlights of customers' vehicles, though nearby streetlights provided the parking lot with some light. When the male clerk heard a gunshot, he called law enforcement.
A customer (hereinafter "the bystander") testified that he was scratching lottery tickets at the lottery machine when he heard an altercation begin inside the store. Feeling nosy, he kept an eye on the situation while continuing to scratch his lottery tickets. According to the bystander, the altercation began when two men started harassing defendant, whom he knew from the community. Soon after, the victim — the bystander's former coworker — entered the store and pointed out a surveillance camera to the group. The two men, defendant and the victim then exited the store but continued to argue near the door. The bystander asserted that defendant began to walk away, passing between two cars parked near the storefront, and directly in front of where the lottery machine [*3]was located inside. The bystander saw the two men follow defendant; a few seconds later, the victim followed, positioning himself between defendant and the two men. The bystander admitted that his view of defendant was obstructed by one of the parked vehicles, but he was able to see defendant's shoulders and his orange hat walking away. Then, he saw defendant's shoulders move as he turned around to face the victim. As the bystander looked down at a lottery ticket, he heard a gunshot. When he looked up, the bystander saw defendant walk to the sidewalk and then run toward Elmira College. The bystander then went outside, where he saw the victim, who had been shot, on the ground.
A college student testified that she heard the gunshot from her fourth-floor apartment. When she looked out the window, she saw a man in an orange hat jogging and yelling, "call the cops, someone's been shot." An off-duty firefighter testified that he did not hear the gunshot, but he saw that the victim had a bullet wound near the center of his chest, so he provided first aid until the fire department arrived. Two Elmira Police Department officers testified, with the first officer asserting that the victim shared his name with the police but was otherwise uncooperative. The first officer viewed surveillance videos from inside the store and recognized defendant as the man in the orange hat. Both officers asserted that the female clerk and the men present with the victim refused to cooperate. The second officer photographed the scene, and he noticed a spent bullet on the victim's clothing, which had been cut off of him by the paramedics. The surgeon who operated on the victim that night testified that the victim had an entry wound near the center of his chest and an exit wound in his back. Further, he testified as to the victim's extensive injuries and that, had the victim not received immediate medical attention, his injuries would likely have been fatal.
Two surveillance videos, which do not include audio, show that when defendant entered the store, a man approached him, and a second man followed shortly thereafter. The female clerk stepped in between them and, soon after, the victim entered and pointed directly at one of the cameras. The men then exited the store. One video shows them standing near the front door. After that, defendant can be seen walking off-camera, and the other men follow. The shooting was not captured by either camera.
Defendant argues that his convictions are not supported by legally sufficient evidence because none of the witnesses testified that they saw him firing a weapon and, as such, he was not identified as the shooter. While none of the witnesses saw a weapon, the bystander testified as to his observation of an altercation between the two men and defendant. After defendant attempted to walk away, the bystander saw the two men and the victim follow him. While the bystander admitted that he did not see a gun, he saw that, as defendant turned [*4]around to face the victim, defendant moved his shoulder, after which the bystander heard a gunshot. Upon stepping outside, he saw the victim on the ground. The evidence also established that the victim suffered a gunshot wound. Although the proof adduced at trial lacked direct evidence that defendant fired a weapon, viewing the evidence in the light most favorable to the People, a valid line of reasoning existed through which the jury could have found that defendant's conduct met the elements of each crime for which he was convicted (see People v Campbell, 196 AD3d 834, 836-837 [3d Dept 2021], lv denied 37 NY3d 1025 [2021]; People v Banks, 181 AD3d 973, 975 [3d Dept 2020], lv denied 35 NY3d 1025 [2020]; People v Maeweather, 172 AD3d 1646, 1648 [3d Dept 2019], lv denied 34 NY3d 1017 [2019]).
Next, as to defendant's contention that the verdict is against the weight of the evidence, we note that a different outcome would not have been unreasonable. Defense counsel highlighted the male clerk's testimony that he was unable to see outside due to a glare on the window and various objects obstructing his view. Counsel cross-examined the bystander about his ability to see out the window and witness the shooting. Notably, however, these witnesses had different vantage points from within the store: the male clerk was counting inventory and moving around the store, while the bystander was peering around the side of the lottery machine while scratching lottery tickets. Further, the surveillance videos supported the observations of both witnesses regarding the altercation that took place inside the store. Having been presented with these opposing theories, the jury was then free to credit or discredit the bystander's version of events, and such credibility determinations are implicit in its verdict. Having reviewed the record evidence in a neutral light and deferring to such credibility determinations, we find that the verdict convicting defendant is supported by the weight of the evidence (see People v Calafell, 211 AD3d 1114, 1117-1118 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]; People v Castro, 206 AD3d 1444, 1447 [3d Dept 2022], lv denied 38 NY3d 1132 [2022]; People v Campbell, 196 AD3d at 837; People v Banks, 181 AD3d at 975).
Lastly, defendant challenges his sentence as unduly harsh and excessive or, alternatively, asks that we reduce his sentence in the interest of justice. Specifically, defendant complains that County Court commented on the large number of shootings that occur in our society, and that the court impermissibly punished him. Having reviewed the record, we discern no basis upon which to disturb the sentence. Defendant was convicted of two class B violent felonies, two class C violent felonies and a class D felony (see Penal Law §§ 70.02 [1] [a], [b]; 265.02). He was sentenced as a second violent felony offender, and the court noted that defendant had three prior felony convictions and numerous misdemeanor convictions dating back to the [*5]early 1990s. Considering defendant's extensive criminal history, the lack of any expression of remorse, the seriousness of the victim's injuries and the crimes for which defendant was convicted, the sentence is not unduly harsh or severe, and we decline to exercise our interest of justice jurisdiction to take corrective action (see People v Calafell, 211 AD3d at 1121; People v Castro, 206 AD3d at 1451; People v Townsend, 144 AD3d 1196, 1197 [3d Dept 2016], lv denied 28 NY3d 1189 [2017]).[FN1]
Egan Jr., J.P., Pritzker, Ceresia and Fisher, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Although County Court was permitted to impose an additional, consecutive five-year prison term to defendant's sentence (see Penal Law § 265.09 [2]), it did not do so here.