People v Marin (2025 NY Slip Op 03357)

People v Marin

2025 NY Slip Op 03357

Decided on June 5, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 5, 2025

111185
[*1]The People of the State of New York, Respondent,
v
Victor Marin, Also Known as Pito Hulk, Appellant.

Calendar Date:April 23, 2025

Before:Clark, J.P., Aarons, Ceresia, Fisher and McShan, JJ.

Gail B. Rubenfeld, Monticello, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

McShan, J.
Appeal from a judgment of the Supreme Court (Kathleen Hogan, J.), rendered January 15, 2019 in Schenectady County, upon a verdict convicting defendant of the crimes of assault in the first degree, attempted assault in the first degree, criminal possession of a weapon in the second degree (two counts) and endangering the welfare of a child.
Arising from a shooting that occurred in the City of Schenectady in September 2017, defendant was charged by indictment with attempted murder in the second degree (count 1), assault in the first degree (count 2), attempted assault in the first degree (count 3), two counts of criminal possession of a weapon in the second degree (counts 4 and 5) and endangering the welfare of a child (count 6). Following a jury trial, at which defendant pursued a justification defense, he was acquitted of count 1 and convicted of the remaining charges. Defendant was sentenced, as a second violent felony offender, to a prison term of 20 years, to be followed by five years of postrelease supervision, on the conviction for count 2, and to lesser concurrent terms of incarceration on the remaining convictions. Defendant appeals.
We affirm. Defendant contends that each of his convictions, with the exception of count 4, are unsupported by legally sufficient evidence and, for the same reasons, that the jury's verdict as to those convictions is against the weight of the evidence. Although defendant initially moved to dismiss at the close of the People's proof, his failure to renew that motion after presenting his case renders his legal sufficiency arguments unpreserved (see People v Tenace, 229 AD3d 908, 909 [3d Dept 2024]; People v Oates, 222 AD3d 1271, 1272 [3d Dept 2023]). "Nevertheless, in the course of reviewing defendant's weight of the evidence challenge, this Court necessarily evaluates whether all elements of the charged crimes were proven beyond a reasonable doubt" (People v Osman, 228 AD3d 1007, 1008 [3d Dept 2024] [internal quotation marks and citations omitted]; see People v Franklin, 216 AD3d 1304, 1305 [3d Dept 2023], lv denied 40 NY3d 934 [2023]). In doing so, "we first determine whether, based upon all of the credible evidence, a different verdict would have been unreasonable and, if it would not have been, we then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Taylor, 207 AD3d 806, 807 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 942 [2022]).
The evidence at trial established that the night before the shooting, defendant and an individual by the name of Israel Grimes were involved in two separate altercations outside of a grocery store on Albany Street. The first altercation entailed Grimes and a group of individuals shouting threats toward defendant after accosting defendant's acquaintance. Defendant [*2]returned later with two friends and observed Grimes alone, at which point defendant approached Grimes and punched him in the face. The following day, Grimes was walking on Albany Street with his girlfriend, along with the girlfriend's two-year-old child, who she was pushing in a stroller, and the victim. According to the victim's testimony, as the group passed the aforementioned grocery store, Grimes saw defendant and approached him while displaying a handgun in his waistband. At that point, defendant briefly retreated into the grocery store. Defendant and Grimes confronted each other two more times directly outside the grocery store, with Grimes at one point utilizing the victim's shirt to cover his face. Grimes then continued walking north on Albany Street toward the intersection with Hulett Street, turning down Hulett Street with the victim, the girlfriend and the stroller. Meanwhile, from inside the store, defendant called an acquaintance for help, and that acquaintance drove to the area, came to the front of the grocery store and handed defendant a small bag that contained a handgun. At that point, defendant ran in the direction that Grimes had traveled and stood behind a parked vehicle. Grimes returned to Albany Street and approached defendant, walking into the middle of the road with the victim a few steps behind. When Grimes turned away from defendant, defendant began shooting in his direction, firing several shots, one of which struck the victim in the leg as he retreated toward the corner. Immediately prior to the shooting, the girlfriend had returned to the corner and was observing the altercation until defendant started shooting, at which point she also retreated further down Hulett Street.
For his part, defendant testified that he was familiar with Grimes and that he knew him to carry a firearm. Defendant indicated that there were two altercations between him and Grimes the night before the shooting and acknowledged that, after the initial altercation, he asked two friends to return to the grocery store to confront Grimes and that he punched him in the face during this second encounter. Defendant testified that, in the minutes preceding the shooting, he and Grimes exchanged words and during that encounter he observed Grimes in possession of a handgun tucked in his waistband. According to defendant, he was nervous during the interaction, precipitating him to call his friend for help, although, by defendant's account, he did not know that his friend was going to bring him a gun. In an effort to explain why he traveled in the same direction as Grimes, who had previously left the grocery store, defendant testified that he was trying to return to a family member's house when he saw Grimes at the intersection of Albany Street and Hulett Street. By defendant's telling, he had no intention of hurting anyone, but the manner in which Grimes approached him at the intersection, his movements toward the waistband where his gun was and his prior threats [*3]to kill defendant led defendant to shoot at Grimes, but only with the intent to scare him.
With respect to the assault and attempted assault charges underlying counts 2 and 3 (see Penal Law §§ 110.00, 120.10 [1]), defendant contends that the People failed to meet their burden "to demonstrate beyond a reasonable doubt that [defendant] did not believe deadly force was necessary or that a reasonable person in the same situation would not have perceived that deadly force was necessary" (People v Harris, 206 AD3d 1063, 1064 [3d Dept 2022] [internal quotation marks and citations omitted]; see People v Wilkins, 216 AD3d 1359, 1361 [3d Dept 2023], lv denied 40 NY3d 1000 [2023]). Initially, we find that a different verdict would not have been unreasonable based upon the various observations that Grimes was in possession of a handgun and defendant's testimony suggesting his fear that Grimes intended to shoot him during their interaction. Nevertheless, we do not find that the verdicts are against the weight of the evidence. "[A] person who reasonably believes that another is about to use deadly physical force is not free to reciprocate with deadly physical force if such person knows that he or she can with complete safety as to himself, herself and others avoid the necessity of so doing by retreating" (People v Wilkins, 216 AD3d at 1361). To that point, "a defendant who may be justified in using deadly physical force at the start of an encounter loses the right to use such force at the point he can no longer reasonably believe the assailant still poses a threat to him" (People v Castillo, 42 NY3d 628, 631 [2024] [internal quotation marks and citations omitted]). The evidence in this case reflects that, after defendant was provided with the handgun from his acquaintance, he pursued Grimes several blocks to the intersection where the shooting took place rather than taking advantage of a clear opportunity to leave the area. More importantly, as depicted in the various angles of video footage, Grimes was moving away from defendant and turning his back at the point where defendant began discharging his weapon in the direction of Grimes and the victim, casting doubt on defendant's asserted belief that deadly physical force against him was imminent or that he could not safely retreat (see People v Decamp, 211 AD3d 1121, 1124 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]; People v Cutting, 206 AD3d 1281, 1282 [3d Dept 2022]; People v Warner, 194 AD3d 1098, 1104 [3d Dept 2021], lv denied 37 NY3d 1030 [2021]; see also People v Del-Debbio, 244 AD2d 195, 195 [1st Dept 1997], lv denied 91 NY2d 925 [1998]).[FN1] The jury was able to assess the video footage alongside the testimony in this case, including defendant's own description of the events, and we find no reason, viewing the evidence in a neutral light, to disturb its determination that defendant was not justified in discharging his weapon and, in turn, that he intended to cause serious physical injury to Grimes.[FN2]
Defendant [*4]also contends, specific to his conviction on count 2 for assault in the first degree, that the victim did not suffer a "[s]erious physical injury" within the meaning of Penal Law § 10.00 (10). We reject that argument. Serious physical injury is defined as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ" (Penal Law § 10.00 [10]). The testimony from the victim's treating orthopedic surgeon established that the victim's initial X-rays indicated a multi-fragmented fracture to his right tibia and fibula. At the outset, the victim underwent multiple surgeries to stabilize his leg, first with external fixation and then with the insertion of a rod and metal plates. According to the surgeon, at the time of trial the victim's tibia was not completely healed and "[b]ecause of the gunshot wound and the severe shattering of his bone that had to be taken out, there exists a fairly large gap in his tibia," which would require additional surgery. That fact, along with the continued festering of the wound, necessitated a course of surgeries that, barring complication, would take between 6 and 10 months. All told, the testimony established that the victim will have undergone no less than 10 surgeries over two years. Further, although the surgeon testified that he hoped the victim could functionally do well if the surgeries were successful, he noted that the victim will continue to have weakness in his ankle function from the loss of muscle tissue, a limp and scars. The surgeon also testified that a good outcome was by no means guaranteed, assessing a 25-50% chance that the surgical course would not be successful. The foregoing, considered alongside the victim's testimony that, as of 13 months after the shooting when the trial took place, he continued to walk with a limp, had various physical limitations and was still in severe pain, provided a sufficient basis for the jury to conclude that the victim suffered a protracted impairment of his health, and we do not find that its determination in that respect is against the weight of the evidence (see People v Rice, 90 AD3d 1237, 1238 [3d Dept 2011], lv denied 18 NY3d 961 [2012]; People v Casey, 61 AD3d 1011, 1013 [3d Dept 2009], lv denied 12 NY3d 913 [2009]; see also People v Huggins, 236 AD3d 440, 441 [1st Dept 2025]; People v Fisher, 221 AD3d 1355, 1357 [3d Dept 2023], lv denied 40 NY3d 1092 [2024]; compare People v Dillon, 231 AD3d 1352, 1355 [3d Dept 2024]; People v Marshall, 162 AD3d 1110, 1113 [3d Dept 2018], lv denied 31 NY3d 1150 [2018]).
As to count 6 charging him with endangering the welfare of a child (see Penal Law § 260.10 [1]), defendant contends that the evidence failed to establish that the shooting was likely to cause harm to the welfare of the child victim based upon the location of the stroller during the shooting. The video footage [*5]contradicts that contention, as it depicts the girlfriend with the stroller at the corner of the intersection observing the interaction between the victim, Grimes and defendant. Further, the footage depicts the girlfriend flinching when defendant first fired his weapon at Grimes, at which point she quickly backs the stroller away. The physical proof at trial also established that discharged projectiles were recovered from the building across the street, establishing that defendant was firing in the direction of the corner where the stroller was located. Altogether, this proof provided a reasonable basis to conclude that the child was at risk of physical harm from defendant's conduct (see Penal Law § 260.10 [1]).
Finally, with respect to count 5, defendant contends that his possession of a handgun with intent to use said weapon unlawfully was justified based upon his intent to defend himself against Grimes (see Penal Law § 265.03 [1] [b]). That argument is without merit, as "there are no circumstances when justification can be a defense to the crime of criminal possession of a weapon" (People v Graham, 215 AD3d 998, 999 [3d Dept 2023] [internal quotation marks and citation omitted], lv denied 40 NY3d 928 [2023]; see People v Castillo, 42 NY3d at 632).
Clark, J.P., Aarons, Ceresia and Fisher, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Although defendant does not expressly argue that he did not intend to cause serious physical injury to Grimes, that intent can be readily inferred from his use of a handgun in the manner at issue (see People v Jenkins, 215 AD3d 1118, 1122 [3d Dept 2023], lv denied 40 NY3d 997 [2023]; see also People v Shaw, 230 AD3d 599, 601 [2d Dept 2024]).

Footnote 2: Defendant's conviction for assault in the first degree under count 2 was predicated on the injury suffered by the victim under a theory of transferred intent (see generally People v Burton, 215 AD3d 1054, 1059 [3d Dept 2023], lv denied 40 NY3d 927 [2023]).