People v Trowell
2026 NY Slip Op 04005
June 25, 2026
Appellate Division, Third Department
Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.
This decision is uncorrected and subject to revision before publication in the Official Reports.

The People of the State of New York, Respondent,
v
Abdul Trowell, Appellant.

Decided and Entered:June 25, 2026
110963
Calendar Date: April 28, 2026
Before: Garry, P.J., Clark, Fisher, Mackey And Ryba, JJ.

Craig S. Leeds, Albany, for appellant.
Lee C. Kindlon, District Attorney, Albany (Emily Schultz of counsel), for respondent.

[*1]
Clark, J.
Appeal from a judgment of the County Court of Albany County (William Carter, J.), rendered December 20, 2018, upon a verdict convicting defendant of the crimes of kidnapping in the second degree as a sexually motivated felony, rape in the first degree and criminal possession of a weapon in the third degree.
Defendant was charged by indictment with kidnapping in the second degree as a sexually motivated felony, rape in the first degree and criminal possession of a weapon in the third degree in connection with allegations that he brought an intoxicated woman (hereinafter the victim) and the man she was dating (hereinafter the acquaintance) back to his residence after meeting them at
a bar, threatened the acquaintance with a knife, demanded that he leave, and then had sexual intercourse with the victim while she was unconscious. Following a jury trial, defendant was convicted as charged and sentenced, as a second felony offender, to concurrent prison terms the greatest of which is 15 years, to be followed by 15 years of postrelease supervision. Defendant appeals.
We turn first to defendant's argument that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence. Initially, defendant's legal sufficiency challenge is preserved only as it pertains to the abduction element of the kidnapping charge and the intent element of the weapon possession charge, as his trial order of dismissal at the close of the People's proof was limited accordingly (see People v Strange, 247 AD3d 1358, 1359 [3d Dept 2026]). Nevertheless, we will address the adequacy of the proof as to each element of the charged crimes in the context of defendant's weight-of-the evidence challenge, which bears no preservation requirement (see People v Zeoli, 248 AD3d 1422, 1423 [3d Dept 2026]).
As charged to the jury, a person is guilty of kidnapping in the second degree as a sexually motivated felony "when he [or she] abducts another person" (Penal Law § 135.20) "for the purpose, in whole or substantial part, of his or her own direct sexual gratification" (Penal Law § 130.91 [1]). " 'Abduct' means to restrain a person with intent to prevent his [or her] liberation by either (a) secreting or holding him [or her] in a place where he [or she] is not likely to be found, or (b) using or threatening to use deadly physical force" (Penal Law § 135.00 [2]). Restrain means "to restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his [or her] liberty by moving him [or her] from one place to another, or by confining him [or her] either in the place where the restriction commences or in a place to which he [or she] has been moved, without consent and with knowledge that the restriction is unlawful" (Penal Law § 135.00 [1]). As for the rape charge, at the time of the underlying offense, a person was guilty of rape in the first degree when, as relevant here, "he or she engage[d] in sexual intercourse with another person . . . who [wa]s incapable of consent by reason of being physically helpless" (Penal Law § 130.35 [former (2)]). " 'Physically helpless' means that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act" (Penal Law § 130.00 [7]). Finally, "[a] person is guilty of criminal possession of a weapon in the third degree when . . . [s]uch person commits the crime of criminal possession of a weapon in the fourth degree . . . and has been previously convicted of any crime" (Penal Law § 265.02 [1]). A person is guilty of criminal possession of a weapon in the fourth degree when, as relevant here, "[h]e or she possesses any. . . dangerous knife . . . with intent to use the same unlawfully against another" (Penal Law § 265.01 [2]).
The trial testimony demonstrated that the acquaintance and the victim began casually dating shortly before the underlying incident, which occurred during the early morning hours of November 6, 2017. As for the circumstances precipitating the charges against defendant, the acquaintance testified that he met the victim at a restaurant in the City of Troy, Rensselaer County around 8:00 p.m. on November 5, 2017 and they hung out at the establishment with some friends. The acquaintance believed the victim had one beer at the restaurant before accompanying him to the City of Albany to retrieve his truck, which was parked outside of a local bar. The acquaintance recalled arriving at the bar around 9:30 or 10:00 p.m. and ordering alcohol there, estimating that the victim had one beer before switching to scotch. In total, the acquaintance believed that the victim consumed three scotches at the bar, which "may have been double[ ]" pours. At some point thereafter, defendant — with whom the acquaintance had previously interacted on a few occasions at the establishment — walked into the bar and they all began hanging out, with the acquaintance describing the victim as "a little tipsy." The group subsequently began dancing together and the acquaintance described the victim as being "completely intoxicated" by that point. Upon noticing the victim's condition, the acquaintance helped her to the bathroom, where she fell down and began to cry. A little while later, defendant entered the bathroom and helped to comfort the victim, who did not respond when he asked if she was okay. The acquaintance testified that he, defendant and another patron of the bar assisted the victim in walking to the acquaintance's truck, placed her in the back seat, and she "[i]mmediately . . . passed out."
The acquaintance confirmed that he was planning to take the victim back to his apartment to sleep, but defendant asked him for a ride back to his own apartment and the acquaintance obliged. Although the acquaintance "expect[ed] [defendant] to just get out" of his truck when he pulled up to his apartment building, defendant instead opened the back door, picked the victim up and carried her into his apartment while stating that "he was going to take care of her." The acquaintance, who described being "pretty shocked" by such conduct, ended up parking his truck and entered defendant's apartment, explaining that the doors were open and that the victim was lying on the couch with a blanket over her body. The acquaintance confirmed that the victim was "completely incoherent" and unresponsive and that he sat on the couch with her because he did not want to leave her alone with defendant, whom she had just met. Although the acquaintance stayed at defendant's apartment for about an hour, he testified that defendant eventually told him to leave and became aggressive when he refused to do so, at one point going to the kitchen and walking back toward the acquaintance with "a large kitchen knife" that was 10 to 12 inches long. The acquaintance testified that he persisted in his refusal to leave even after defendant pointed the knife at him, following which defendant retrieved a drill, placed his cell phone on a table and made a recording on which he dictated that he was telling the acquaintance that he needed to leave. The acquaintance believed defendant made such a recording so that he would have a defense in the event defendant decided to stab him. Feeling "[e]ven more threatened" at that point, the acquaintance walked toward defendant's front door, stood there and tried to convince defendant to let him take the victim home, but he left after defendant walked toward him with the knife.
Upon leaving defendant's apartment, the acquaintance immediately called 911 and explained that the victim was inside of defendant's apartment intoxicated, that defendant had pulled a knife on him, and that he was concerned that defendant was going to rape the victim. Three police officers responded to the scene and separately interviewed the acquaintance and defendant, who had exited his apartment and followed the acquaintance up the sidewalk. The officers were at the scene for a little over an hour and sought defendant's consent to enter his apartment to check on the victim, but he refused, stating that his sister would drive her home in the morning. Upon concluding that the victim was not in any immediate danger, the officers asked the acquaintance to leave and he complied, walked to his truck and slept in his truck. The acquaintance testified that when he awoke the next morning, he texted the victim to check on her and she initially responded that she was okay. However, she later informed him that she was not okay and he ended up accompanying her to the police station, where she filed a police report for rape. Consistent with such testimony, the People entered into evidence screenshots of the text message exchange between the victim and the acquaintance that morning, in which the victim relayed that she had woken up while defendant was having sex with her, asked defendant who he was, and he responded that the "cops said [she] was safe [there]."
As for the physical evidence relative to the rape charge, the victim underwent an examination by a Sexual Assault Nurse Examiner (hereinafter SANE exam) on November 7, 2017 at Albany Medical Center. The nurse who performed the SANE exam testified that the victim informed her that she had consumed alcohol on the evening in question and later awoke to defendant having rough sex with her from behind. During the exam, the SANE nurse located bruises on both of the victim's arms and on her lower back, which was consistent with the position the victim described being in when she woke up to defendant having intercourse with her. No injuries were located during the victim's vaginal exam, but the SANE nurse confirmed that this was not uncommon and that the findings from the examination were consistent with the victim's allegations.
After the victim filed a police report, police executed a search warrant at defendant's residence on November 7, 2017, where they recovered the victim's underwear, a kitchen knife, bedding, two cell phones and a tablet. The victim's underwear was found under the cushion of a loveseat in defendant's living room and the kitchen knife was found on a kitchen table, leaning against a drill. Police ultimately transported defendant to the police station for questioning, after which he was arrested. Although no sperm was located on the perianal, cervical, vulvar or vaginal swabs obtained during the victim's SANE exam, Y-STR DNA was found on the cervical swab and on the crotch of the victim's underwear that had been retrieved from defendant's residence. At trial, a forensic analyst testified that the DNA profile on such swabs matched defendant's profile and did not match the acquaintance's profile, meaning that defendant and "his biological paternal relatives [could] be included as possible contributors" to the DNA.
The People also elicited testimony from the victim in support of the rape charge. She confirmed that she was a heavy drinker at the time of the underlying incident and testified consistently with the acquaintance as to her recollection of the evening in question. Specifically, she testified that she drank one beer at a restaurant in Troy with the acquaintance and his friends around 8:30 p.m. on November 5, 2017 before accompanying him to the bar in Albany. Like the acquaintance stated, the victim recalled having three scotches at the bar and then "all of a sudden feeling really" intoxicated. Although she could not say with clarity, she testified at trial that she "t[hought] [she] remember[ed] seeing . . . defendant" at the bar and that the last thing she remembered from that establishment was getting up to dance. Her next memory was of waking up "at a home that [she was] not familiar with" with "someone . . . having sex with [her] from behind." The victim testified that she was face down at the time and "had to . . . use [her] arms to turn around" to see who was having sex with her, identifying the individual as defendant. The victim further testified that, when she awoke, her shirt was "half undone" as if it had been "ripped open or opened up" and that she had no pants or underwear on. She explained that she asked defendant who he was and he identified himself as the person she was dancing with at the bar and stated that police had said she was safe at his residence. The victim further testified that defendant stopped having sex with her when she turned around and asked him who he was and that he then got her something to eat, before the victim and defendant fell asleep on the couch with their feet facing each other. She then awoke again around 10:15 a.m. and asked defendant to walk her to her car, which he did. On cross-examination, the victim conceded that she did not "recall much about the evening" and that, in November 2017, she frequently consumed alcohol and had several sexual experiences while intoxicated. She also confirmed that she did not feel like she had to stay at defendant's apartment when she woke up and that he did not make any threats toward her.
In addition to the foregoing, the People also submitted as evidence defendant's videotaped interview with law enforcement prior to his arrest on November 7, 2017. During the interview, defendant admitted that he hung out with the victim and the acquaintance at the bar on the evening in question, that the victim was intoxicated and that the acquaintance stated that he was going to bring her home, but they ultimately ended up coming back to defendant's apartment. Defendant further admitted that he picked the victim up from the back seat of the acquaintance's vehicle, carried her into his apartment and laid her on his couch. He claimed that he eventually asked the acquaintance to leave his apartment because he was concerned about the acquaintance driving the victim home after having consumed alcohol. Defendant informed the interviewing officer that he told the acquaintance to return at 8:00 a.m. the following morning to pick the victim up and denied threatening the acquaintance with a knife. He did, however, admit to picking up a drill while asking the acquaintance to leave his apartment and had no rational explanation for doing so when pressed by the interviewing officer. Later during the interview, defendant admitted that he and victim had "a little intercourse," but claimed that it was consensual, occurred after the victim came over to him with her pants off, and that she was awake and not intoxicated.
Addressing defendant's preserved legal sufficiency arguments, we conclude that, when viewing the foregoing evidence in the light most favorable to the People, there is a "valid line of reasoning and permissible inferences" from which the jury could conclude beyond a reasonable doubt that defendant was guilty of the kidnapping and weapon possession charges (People v James,245 AD3d 1102, 1104 [3d Dept 2026] [internal quotation marks, citations and brackets omitted], lv denied 45 NY3d 946 [2026]; see People v Bender,___ NY3d ___, ___, 2026 NY Slip Op 01444, *1 [Mar. 17, 2026]). As for the abduction element of the kidnapping charge, the testimony that defendant grabbed the victim out of the acquaintance's vehicle while she was unconscious and a stranger to him, carried her into his apartment, pulled a knife on the acquaintance to get him to leave, refused to allow police to enter his apartment to check on the victim, and then had sexual intercourse with her while she was incapacitated supports a finding that defendant "restrain[ed the victim] with intent to prevent [her] liberation by . . . secreting or holding [her] in a place where [s]he [was] not likely to be found" (Penal Law § 135.00 [2] [a]), and that he did so for the purpose, in whole or substantial part, of his own direct sexual gratification (see Penal Law § 130.91 [1]). Defendant's intent to prevent the victim's liberation can also be inferred from his comments to the victim upon her discovery of her presence in his apartment — i.e., that defendant told the victim that "the police said you were safe here" (see People v Delp, 156 AD3d 1450, 1452 [4th Dept 2017], lv denied 31 NY3d 983 [2018]). Regarding the criminal possession of a weapon in the third degree charge, given the acquaintance's testimony about the circumstances under which defendant pulled a knife on him and that defendant made a recording in which he dictated that he was telling the acquaintance to leave, the jury could reasonably infer that defendant possessed the knife with the intent to use it unlawfully against the acquaintance (see Penal Law §§ 265.01 [2], 265.02 [1]). Accordingly, the verdict on these charges is supported by legally sufficient evidence (see People v Petit, 230 AD3d 1337, 1339 [2d Dept 2024], lv denied 42 NY3d 1054 [2024]; People v Jenkins, 215 AD3d 1118, 1121-1122 [3d Dept 2023], lv denied 40 NY3d 997 [2023]; People v Vandenburg, 189 AD3d 1772, 1776 [3d Dept 2020], lv denied 36 NY3d 1054 [2021]).
Turning to the weight of the evidence, a different verdict would not have been unreasonable had the jury believed that the evening unfolded in the manner described by defendant during his police interview. However, the conflicting accounts of the evening and defendant's primary motivation for his conduct presented credibility questions for the jury to resolve (see People v Whitbeck, 248 AD3d 1512, 1515 [3d Dept 2026]; People v White, 231 AD3d 1429, 1432 [3d Dept 2024], lv denied 42 NY3d 1082 [2025]; People v Heidrich, 226 AD3d 1096, 1097-1098 [3d Dept 2024], lv denied 42 NY3d 927 [2024]). When viewing the evidence in a neutral light and deferring to the jury's credibility determinations in favor of the victim and the acquaintance, we conclude that the verdict on all counts is supported by the weight of the evidence (see People v White, 231 AD3d at 1432; People v Vandenburg, 189 AD3d at 1776; People v Dunham, 172 AD3d 1462, 1463 [3d Dept 2019], lv denied 33 NY3d 1068 [2019]; People v Fuller, 50 AD3d 1171, 1174 [3d Dept 2008], lv denied 11 NY3d 788 [2008]).
Next, we are unpersuaded by defendant's argument that the crimes of kidnapping in the second degree and rape in the first degree should have been merged into a single offense. "The merger doctrine applies when acts constituting the crime of kidnapping are so much the part of another substantive crime that the substantive crime could not have been committed without such acts and that independent criminal responsibility may not fairly be attributed to them" (People v Bonilla, 229 AD3d 850, 853 [3d Dept 2024] [internal quotation marks and citations omitted], lv denied 42 NY3d 1018 [2024]). That is not the case here, as the crimes were discrete and the "kidnapping was not merely the incidental means employed to facilitate the commission of" the rape (id. at 854 [internal quotation marks and citation omitted]).
Defendant also challenges County Court's suppression ruling on several grounds. First, he contends that the search warrant for his premises was invalid because it failed to list the apartment number of the residence to be searched or to state the alleged criminal activity being investigated. Accordingly, he argues that the evidence seized from his apartment should have been suppressed. We disagree. "The Fourth Amendment to the Constitution provides that no warrants shall issue except those particularly describing the place to be searched, and the things to be seized" (People v Brown, 96 NY2d 80, 84 [2001] [internal quotation marks, ellipsis and citation omitted]; see CPL 690.15 [1] [a]). Nonetheless, "[w]hile particularity of a search warrant is certainly required, this does not mean that hypertechnical accuracy and completeness of description must be attained but rather, from the standpoint of common sense, that the descriptions in the warrant and its supporting affidavits be sufficiently definite to enable the searcher to identify the persons, places or things that the Magistrate has previously determined should be searched or seized" (People v Thomas, 155 AD3d 1120, 1121 [3d Dept 2017] [internal quotation marks, brackets and citations omitted], lv denied 31 NY3d 1018 [2018]; see People v Vandebogart, 158 AD3d 976, 977-978 [3d Dept 2018], lv denied 31 NY3d 1089 [2018]). "By contrast, a warrant lacks particularity when it is not specific enough to leave no discretion to the executing officer" (People v Alexander, 207 AD3d 878, 880 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 984 [2022]).
At the time of the underlying offenses, defendant was residing in an apartment on the first floor of a multi-unit residential building in the City of Albany. The warrant authorizing a search of defendant's apartment described the area to be searched as "[t]he interior [first floor] apartment and exterior of the residence" of a specific address and detailed the property that police were authorized to search for and to seize, including, among other things, women's blue lace underwear, "[s]tainless steel kitchen knives 9-12 inches long," and "any or all bedding, linen and clothes." Although the warrant did not list the number of the apartment to be searched, the warrant application identified defendant as the subject of the search, provided the address of his building and a description of the alleged criminal activity being investigated, and revealed that evidence of the alleged crimes may be found in "[t]he interior [first floor] [a]partment and exterior of the residence." Correspondingly, the testimony adduced during the suppression hearing established that the officers who executed the warrant were familiar with defendant's apartment, knew that it was on the first floor and that it was apartment No. 1. They also were familiar with the nature of the allegations against defendant as set forth in the victim's interview. In these circumstances, "the search warrant was sufficiently particularized to enable the police officers to identify the place intended to be searched" and the failure to specify the apartment number did not render the warrant invalid (People v German, 251 AD2d 900, 901-902 [3d Dept 1998], lv denied 92 NY2d 897 [1998]; see People v Davenport, 231 AD2d 809, 810 [3d Dept 1996], lv denied 89 NY2d 921 [1996]; People v Fahrenkopf, 191 AD2d 903, 903 [3d Dept 1993]; People v Brooks, 54 AD2d 333, 335 [4th Dept 1976]).
Defendant also challenges the police officers' authority to seize the blue lace women's underwear, bedding, sheets and linens from his apartment pursuant to the terms of the search warrant, arguing that there "[wa]s no information contained within the [supporting] affidavit that would allow the conclusion to be drawn that [such] items [were] evidence of criminality." We disagree. Pursuant to CPL 690.10 (4), "[p]ersonal property is subject to seizure pursuant to a search warrant if there is reasonable cause to believe that it . . . [c]onstitutes evidence or tends to demonstrate that an offense was committed." Here, the supporting affidavit set forth the victim's allegations against defendant during her police interview, including that she woke up "to an unknown . . . male having unprotected sex with her on a couch." Moreover, the affidavit set forth that there was reasonable cause to believe that certain property, including blue lace women's underwear, bedding and linens would be found at the subject apartment that related to the "investigation regarding the alleged sexual assault of a female" that occurred there. We emphasize that "[s]earch warrant applications are not to be read hypertechnically and may be accorded all reasonable inferences" (People v Rath, 192 AD3d 1600, 1603 [4th Dept 2021] [internal quotation marks and citations omitted], lv denied 37 NY 959 [2021]). In these circumstances, we are satisfied that the allegations set forth in the warrant application provided reasonable cause to believe that the women's blue lace underwear, bedding and linens listed in the search warrant related to the alleged sexual assault described by the victim and, accordingly, the warrant properly authorized the seizure of such property (see generally People v Teicher, 52 NY2d 638, 652 [1981]; compare People v Robinson, 68 NY2d 541, 552 [1986]).
Contrary to defendant's contention, his warrantless arrest did not constitute a Payton violation. Insofar as a reasonable expectation of privacy exists in one's home, absent exigent circumstances, "the Fourth Amendment 'prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest' " (People v Shaw, ___ NY3d ___, ___, 2026 NY Slip Op 00961, *3 [2026], quoting Payton v New York, 445 US 573, 576 [1980]; see People v Nicholas, 118 AD3d 1183, 1187 [3d Dept 2014], lv denied 24 NY3d 1122 [2015]). However, the Court of Appeals has upheld warrantless arrests occurring within the threshold of a suspect's doorway, so long as the arresting officers had probable cause to believe the suspect committed a crime and the suspect "voluntarily c[ame] to the doorway" without being induced by coercive police conduct (People v Shaw, ___ NY3d at ___, 2026 NY Slip Op 00961, *4; see People v Garvin, 30 NY3d 174, 181 [2017]; People v Williams, 239 AD3d 1090, 1095 [3d Dept 2025], lv denied 44 NY3d 985 [2025]).
The evidence at the suppression hearing established that several police officers proceeded to defendant's apartment building on November 7, 2017 to execute the search warrant. An unrelated resident of the building buzzed the officers in and they knocked on defendant's apartment door, but he was not home at the time. The officers then entered defendant's apartment, which was unlocked, and engaged in the search that yielded the physical evidence related to the underlying prosecution. Police left the premises to secure the evidence but returned to the building later that afternoon to see if they could make contact with defendant for the purpose of having him accompany them to the police station for questioning. By that point, the officers were aware, through information obtained from a premises history search, that the building had a history of emotionally disturbed person incidents, including some where the subject was armed with a knife. They were also aware of the victim's and the acquaintance's allegations against defendant, including that he had pointed a knife at the acquaintance.
Upon returning to the building, the officers observed defendant in his apartment through a window, knocked on the window and asked defendant to come to the door. The officers were buzzed into the building and, when they entered, defendant was standing in the open doorway of his apartment. One of the officers had his service weapon drawn at the time and the other had her taser in a "low ready" position. According to the testifying officers, defendant then partially entered the hallway but kept his left hand behind his apartment wall and was "moving it a lot." After defendant repeatedly ignored the officers' commands to show them his hands, one of the officers grabbed his arm, pulled him into the hallway and handcuffed him. Defendant then inquired as to what was going on and police told him they would talk about it back at the police station, informing him that they needed to secure his apartment before transporting him there. Defendant asked the officers to retrieve his keys and his cell phone from the apartment, and he was subsequently transported to the police station for questioning. Following his police interview, defendant was officially arrested in connection with his alleged conduct against the acquaintance involving the knife.
Although defendant was not formally under arrest when he was placed in handcuffs at his apartment building on November 7, 2017, the People do not dispute that defendant was "subjected to a de facto arrest" at that location, thereby "triggering the requirement of [a warrant or] probable cause" (People v Williams, 239 AD3d at 1095). In that regard, we agree with County Court that defendant's de facto arrest at his apartment building was supported by probable cause, as the testimony at the suppression hearing established that the arresting officers were aware of the victim's and the acquaintance's allegations against defendant and had previously obtained evidence during the execution of a search warrant at his apartment tending to corroborate such allegations (see id.; People v Calafell, 211 AD3d 1114, 1119-1120 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]; see also People v Covington, 222 AD3d 1166, 1169 [3d Dept 2023], lv denied 41 NY3d 964 [2024]). County Court also properly rejected defendant's claim of a Payton violation insofar as he was not induced to come to his doorway under coercion and was placed in handcuffs in the building's common hallway (see People v Garvin, 30 NY3d at 181-182; compare People v Shaw, ___ NY3d at ___, 2026 NY Slip Op 00961, *4). To the extent that defendant challenges the officers' conduct of grabbing his arm and pulling him into the hallway, such force was authorized to ensure police officer safety given the information known to the officers at the time and defendant's refusal to comply with the officers' commands to show them his hands (see People v Samuels, 50 NY2d 1035, 1037 [1980], cert denied 449 US 984 [1980]). Moreover, defendant consented to police entering his apartment to retrieve his cell phone and, accordingly, there was no basis to suppress the cell phone retrieved therefrom.
In addition, County Court did not err in declining to suppress the evidence obtained from defendant's cell phone for failure to comply with the statutory time frame in which to execute a search warrant under CPL 690.30. To that end, CPL 690.30 (1) provides that "[a] search warrant must be executed not more than [10] days after the date of issuance and it must thereafter be returned to the court without unnecessary delay." However, the Fourth Amendment does not require "a specific time limit in which a [device] [must] undergo a government forensic examination after it has been seized pursuant to a search warrant" (People v De Prospero, 91 AD3d 39, 45 [4th Dept 2011] [internal quotation marks and citation omitted], affd 20 NY3d 527 [2013]). "Rather, the Fourth Amendment only requires that the subsequent search of the [device] be made within a reasonable time" (id. at 46 [internal quotation marks, brackets and citation omitted]), and "[t]he duration of a warrant's authority is . . . appropriately measured by the persistence of the cause for its issue" (People v Ruffin, 178 AD3d 455, 456 [1st Dept 2019] [internal quotation marks and citation omitted]).
The search warrant for defendant's apartment authorized the seizure of, among other property, any "cell phones" or "recording devices" found at the premises. Police retrieved defendant's cell phone from the apartment the day the warrant was executed. The next day, police obtained a search warrant for defendant's cell phone and a detective thereafter engaged in a preliminary search of its contents later that day. The detective then provided the phone to another detective to download the relevant information, which occurred five days later. Thereafter, the detective engaged in a more thorough
"cell[-]phone dump," meaning that he transferred "the contents of th[e] phone" to discs and made a copy for the District Attorney's office. Given that defendant's cell phone was retrieved from and searched within 10 days of the issuance of the subject search warrants, his argument premised upon a violation of CPL 690.30 (1) is without merit (see People v Blue, 202 AD3d 546, 547 [1st Dept 2022], affd 42 NY3d 584 [2024]; People v Ruffin, 178 AD3d at 456). Defendant provides no relevant support for his related argument that police violated his constitutional rights by accessing his phone on three separate occasions pursuant to the terms of a single warrant and we note that the multiday process used to identify, compile and extract the relevant information from his phone occurred within a reasonable amount of time (compare People v Kiah, 156 AD3d 1054, 1058 [3d Dept 2017], lv denied 31 NY3d 984 [2018]).
County Court also properly denied defendant's motion to suppress the results of a police-generated photo array shown to the victim on November 7, 2017, during which she chose defendant's picture in connection with her rape. Contrary to defendant's contention, the photo array was not unduly suggestive by virtue of the fact that his skin tone, as depicted in his photograph, took on a slightly reddish hue as compared with the other photographs (see People v Marryshow, 162 AD3d 1313, 1314 [3d Dept 2018]; People v Quintana, 159 AD3d 1122, 1127 [3d Dept 2018], lv denied 31 NY3d 1086 [2018]). The array shown to the victim contained six photographs depicting men of the same race, who all appeared to be of the same general age with similar style facial and head hair, along with varying skin tones. The array was conducted in a double-blind fashion and the victim had not been shown or given the photo sheet containing the corresponding names of the depicted individuals prior to choosing defendant's photograph and referring to him by name. We are satisfied in this case that the "feature[s] [and] characteristic[s] of [defendant's] photograph[ ] [were not] so unique or distinctive [as to] draw[ ] the viewer's attention to [his] photograph" in a manner that created "a substantial likelihood that . . . defendant would be singled out for identification" (People v Marryshow, 162 AD3d at 1313 [internal quotation marks and citations omitted]).
Next, defendant challenges County Court's Sandoval ruling permitting inquiry into his convictions from 2005 and 2008, arguing that the convictions were too remote to have any probative value. "Whether and to what extent prior convictions may be used on cross-examination of a defendant is a matter which rests in the sound discretion of the trial court after appropriately balancing the probative worth of the evidence as it relates to the defendant's credibility against the risk of unfair prejudice to the defendant, including whether it would discourage him or her from testifying" (People v Gannon, 174 AD3d 1054, 1059 [3d Dept 2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 980 [2019]; see People v Garcia, 203 AD3d 1228, 1229 [3d Dept 2022], lv denied 38 NY3d 1032 [2023]; People v Cole, 177 AD3d 1096, 1100 [3d Dept 2019], lv denied 34 NY3d 1015 [2019]). There is "no bright line or per se rule requiring preclusion of a prior conviction based on the age or remoteness of the conviction"; however, " 'lapse of time will affect the materiality if not the relevance of previous conduct' " (People v Cole, 177 AD3d at 1100 [ellipsis omitted], quoting People v Sandoval, 34 NY2d 371, 376 [1974]; see People v Gray, 84 NY2d 709, 712 [1995]).
Prior to trial, the People made a Sandoval proffer seeking to cross-examine defendant about his prior criminal history, which included 11 prior criminal convictions and one prior violation, in the event he testified at trial. Defendant opposed the motion on various grounds, including that his prior convictions, spanning from 2002 to 2011, were "extremely remote in time." In fashioning its Sandoval compromise, County Court acknowledged that many of the convictions were "very remote," but allowed inquiry into five prior convictions, including a 2008 conviction for criminal contempt in the second degree and a 2005 conviction for criminal impersonation in the second degree. The court further clarified that, although the People would be permitted full inquiry into the 2005 conviction, including the underlying facts, date of conviction, the level of offense and the sentence imposed, inquiry into the 2008 conviction would be limited to the fact of the conviction, as well as the date and location thereof, without reference to the level of the offense or the underlying facts.
Insofar as defendant's argument challenging County Court's Sandoval compromise is limited to the court's ruling on the aforementioned convictions from 2005 and 2008, he has abandoned any challenge to the ruling on the other convictions (see People v Casey, 214 AD3d 1121, 1123 [3d Dept 2023], lv denied 40 NY3d 927 [2023]). Even though defendant's 2005 conviction for criminal impersonation in the second degree was over a decade old by the time of the underlying trial, the conviction was probative of defendant's credibility and had little potential for unfair prejudice given its dissimilarity to the crimes for which he stood trial (see People v Bowes, 206 AD3d 1260, 1268 [3d Dept 2022]; People v Delbrey, 179 AD3d 1292, 1296 n 2 [3d Dept 2020], lv denied 35 NY3d 969 [2020]). County Court also did not abuse its discretion in permitting limited inquiry into defendant's 2008 conviction for criminal contempt in the second degree, which demonstrated his willingness to put his own interests above those of society, and appropriately dissipated any prejudice by preventing inquiry into the underlying facts and circumstances thereof (see People v Mould, 143 AD3d 1186, 1188 [3d Dept 2016], lv denied 28 NY3d 1187 [2017]).
Furthermore, defendant's challenges to the manner in which County Court resolved certain issues of potential juror misconduct are similarly unpreserved, as he either consented to, failed to object to, or acquiesced to the court's procedures in that regard (see People v Albert, 85 NY2d 851, 852 [1995]). His related argument that County Court erred in failing to inquire as to whether a juror whose wife was acquainted with the court clerk could be fair and impartial is also unpreserved, as defendant agreed with the court that no such inquiry was necessary. As for defendant's claim of prosecutorial misconduct premised upon allegedly prejudicial statements made on summation, he did not object to such statements (see People v Butts, 244 AD3d 1479, 1487-1488 [3d Dept 2025], lv denied 45 NY3d 944 [2026]) and, in any event, the prosecutor stayed within the permissible bounds of a closing argument (see generally People v Galloway, 54 NY2d 396, 399 [1981]; People v Birch, 228 AD3d 991, 993 [3d Dept 2024], lv denied 42 NY3d 969 [2024]).
Defendant's ineffective assistance of counsel claim also is unavailing. Although he faults counsel for various omissions, including his failure to move for a mistrial pertaining to the alleged juror misconduct, to object to the prosecutor's allegedly prejudicial statements on summation, and to cross-examine the victim about certain statements she had made to the prosecutor before trial, such arguments would have had little or no chance of success or not making them may have been a strategic choice (see People v Caban, 5 NY3d 143, 152 [2005]; People v Hoyt, 237 AD3d 1360, 1363 [3d Dept 2025], lv denied 44 NY3d 982 [2025]). When considering the totality of counsel's performance, we are satisfied that defendant was afforded meaningful representation (see People v Whitbeck, 248 AD3d at 1516; People v Rivera, 212 AD3d 942, 948 [3d Dept 2023], lv denied 39 NY3d 1113 [2023]).
Turning to defendant's sentencing challenges, his argument that he was not permitted to make a statement before sentencing pursuant to CPLR 380.50 (1) is unpreserved insofar as he failed to object before the sentence was pronounced (see People v Carrington, 194 AD3d 1253, 1254-1255 [3d Dept 2021]; People v Schmidt, 175 AD3d 754, 755 [3d Dept 2019]). We further note that counsel made an argument advocating for a lesser sentence and defendant was permitted to make a statement following the pronouncement of sentence, largely reiterating the arguments previously made by counsel. Finally, we are unpersuaded by defendant's argument that the sentence imposed is unduly harsh or severe (see CPL 470.15 [6] [b]). Having considered the facts set forth in the presentence report and considering all relevant circumstances, we discern no basis to reduce the sentence in the interest of justice. Defendant's remaining contentions, to the extent not expressly addressed, have been considered and found unavailing.
Garry, P.J., Fisher, Mackey and Ryba, JJ., concur.
ORDERED that the judgment is affirmed.